# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 24, 2012                Decided June 22, 2012

No. 11-1242

106 LTD., DAVID PALMLUND, TAX MATTERS PARTNER,
APPELLANT

v.

COMMISSIONER OF INTERNAL REVENUE SERVICE,
APPELLEE

———

Appeal from the United States Tax Court

———

*Kyle R. Coleman* argued the cause for the appellant.

*Patrick J. Urda*, Attorney, United States Department of Justice, argued the cause for the appellee. *Tamara W. Ashford*, Deputy Assistant Attorney General, and *Kenneth L. Greene*, Attorney, were on brief.

Before: SENTELLE, *Chief Judge*, HENDERSON and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: 106 Ltd. (Partnership), a limited partnership, appearing through its tax matters partner David Palmlund (Palmlund), appeals a decision of the United States Tax Court (Tax Court)

upholding the imposition of a forty per cent accuracy-related penalty by the Internal Revenue Service (IRS). *See 106 Ltd. v. Comm'r*, 136 T.C. 67 (2011). The IRS determined that the Partnership had utilized a so-called "Son of BOSS" tax shelter to overstate its basis in Partnership interests by approximately $3 million and to thereby reduce Palmlund's individual federal income tax liability by nearly $400,000. The sole issue before us is whether the Tax Court erred in determining that the Partnership failed to establish a reasonable cause defense to the accuracy-related penalty pursuant to 26 U.S.C. § 6664(c)(1). As set forth below, we affirm the Tax Court.

## I.

A "Son of BOSS" tax shelter "employs a series of transactions to create artificial financial losses that are used to offset real financial gains, thereby reducing tax liability." *Petaluma FX Partners, LLC v. Comm'r*, 591 F.3d 649, 650 (D.C. Cir. 2010).[1] In 2000, the IRS identified the Son of BOSS tax shelter as an abusive transaction if used to generate artificial (i.e., non-economic) losses for tax purposes. *Tax Avoidance Using Artificially High Basis*, Notice 2000-44, 2000-36 I.R.B. 255 (Sept. 5, 2000). The IRS also indicated

---

[1] The shelter is a "variant of the Bond and Options Sales Strategy ('BOSS') shelter," hence the name. *Napoliello v. Comm'r*, 655 F.3d 1060, 1062 (9th Cir. 2011). The shelter

> involve[s] the transfer of assets along with significant liabilities to a partnership, with the goal of increasing basis in that partnership. The liabilities are not completely fixed at the time of transfer, so the partnership ignores them in computing basis. This results in high-basis assets that produce large tax—but not out-of-pocket—losses.

*106 Ltd.*, 136 T.C. at 70 n.2.

that "purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for federal income tax purposes." *Id.* at 255.

Palmlund is an executive recruiter and business consultant in Dallas, Texas.[2] He has previously held executive positions at several companies, including American Home Shield, Eastman Kodak and Merrill Lynch Realty. Palmlund also operated a real estate investment partnership, formed a family limited partnership called Palmlund Ltd. with the stated purpose of "investments" and actively managed several personal bank and brokerage accounts. *106 Ltd.*, 136 T.C. at 69. For the 2001 tax year, he reported nearly $2 million in income. Since the early 1990s, Palmlund has used Joe Garza as his personal lawyer, including for legal work related to wills and trusts. He has used Turner, Stone & Company, LLP (Turner & Stone), an accounting firm, to prepare his tax returns for more than ten years. According to the Tax Court's findings, Palmlund was an active client who reviewed carefully every return Turner & Stone prepared.

In early 2001, Garza approached Palmlund about a foreign currency investment opportunity that was a variation of a Son of BOSS shelter. Although initially uninterested, Palmlund later warmed up to the idea. After Garza explained the mechanics of the shelter and its tax advantages, Palmlund told Garza that he wanted to consult with Turner & Stone about it. Garza encouraged Palmlund to do so, telling Palmlund that he had worked with Turner & Stone on similar transactions in the past. Turner & Stone advised Palmlund that it had worked on similar shelters and recommended that

---

[2] Unless otherwise noted, the facts are taken from the Tax Court's decision and from the parties' Stipulation of Facts.

4

he proceed. Garza also "guaranteed" the transaction, promising to pay Palmlund's litigation costs if the shelter were challenged and to refund his fee if the shelter were invalidated. Eventually, Palmlund directed Garza to take the necessary steps to implement the tax shelter.

Using the Tax Court's unchallenged description, we provide a brief summary of the shelter's details. In November 2001, Palmlund executed documents forming three entities, all of which he controlled: (1) the Partnership, (2) 32, LLC and (3) 7612, LLC. 7612, LLC bought offsetting long and short foreign currency digital options with premiums of $3 million and $2.97 million, respectively, from Deutsche Bank.[3] The actual cost of the options, however, was only $30,000—the difference in the premiums. 7612, LLC transferred both digital options to the Partnership. Next, 7612, LLC bought $4,000 worth of Canadian currency that it then transferred to the Partnership. Finally, on December 26, 2001, the Partnership distributed thirty-five per cent of the Canadian currency—with a value of $1,400—to Palmlund Ltd., the family limited partnership previously formed by Palmlund. Meanwhile, at Palmlund's request, the Partnership terminated the digital options on December 4 for a profit of $10,000, excluding fees owed to Garza for implementing the shelter (which fees totaled either $72,000 or $95,000).

On the Partnership's 2001 tax return prepared by Turner & Stone, it reported a basis in the distributed Canadian currency of $2,974,000. On Palmlund's individual tax return—also prepared by Turner & Stone—he claimed a flow-through loss of $1,030,491 from the distribution of the

---

[3] An option is digital if its "pay-off [is] a fixed amount if the option expire[s] 'in the money' or nothing at all if the option expire[s] 'out of the money.' " *Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1372 (Fed. Cir. 2010).

Canadian currency. In effect, Palmlund used the Son of BOSS tax shelter to reduce his total income by over $1 million and thereby reduce his tax liability by nearly $400,000.[4] Turner & Stone initially understated Palmlund's loss attributable to the distribution of the Canadian currency because it assumed a distribution of only thirty-three per cent to Palmlund Ltd. Palmlund noticed the error and instructed Turner & Stone to increase the loss to reflect the thirty-five per cent distribution. Trial Tr. at 383.[5] Turner & Stone charged Palmlund $8,000 for preparing the 2001 tax returns for the Partnership, for 32, LLC, for 7612, LLC and for Palmlund individually. In previous years, it had charged Palmlund $1,500 for tax return preparation services, notwithstanding the fact that Palmlund's tax returns before 2001—given his wealth and investments—were complex.

Part of Garza's $72,000 or $95,000 fee was for the preparation of a tax opinion letter regarding Palmlund's Son of BOSS tax shelter. Dated December 30, 2001, the letter consisted of four pages specific to Palmlund's shelter and over eighty pages about general topics like partnership law, disguised-sale provisions and the treatment of foreign currency options. Garza's letter concluded that Turner & Stone's tax treatment of Palmlund's Son of BOSS

---

[4]    As the Tax Court explained, "Son of BOSS transactions usually yield capital losses, but Palmlund offset ordinary income because he attached the high basis to Canadian dollars, . . . [taking] the position that certain foreign-currency transactions may produce an ordinary loss." *106 Ltd.*, 136 T.C. at 70 n.2. Palmlund's reported loss from the Canadian currency was partially offset by other gains and his total reported loss from his interest in Palmlund Ltd. was $1,026,322.

[5]    The Partnership distributed the remaining sixty-five per cent of the Canadian currency in October 2002 but no loss was ever claimed for it.

transactions—including the overstated basis in the Canadian currency—would "more likely than not" withstand IRS scrutiny.

In May 2004, the IRS first communicated with Palmlund by sending him a copy of IRS announcement 2004-46 which outlined the IRS's proposed terms of settlement for any taxpayer utilizing a Son of BOSS tax shelter. After meeting with Garza and with Turner & Stone to discuss his response, Palmlund decided to amend his individual tax return. He removed the $1,030,491 loss attributable to the distribution of the Canadian currency and paid an additional $394,329 in taxes. Palmlund did not amend the Partnership's tax return.

After initiating an administrative proceeding in February 2005 regarding the Partnership's asserted basis in the distributed Canadian currency, the IRS issued a final partnership administrative adjustment (FPAA) to the Partnership on May 5, 2005. The FPAA adjusted the Partnership's basis from $2,974,000 to $0 and, pursuant to 26 U.S.C. § 6662,[6] imposed a forty per cent accuracy-related penalty to the underpayment of taxes resulting from the Partnership's overstatement of its basis in the Canadian currency. The Partnership timely petitioned the Tax Court for a readjustment under 26 U.S.C. § 6226.[7] Subsequently, the Partnership conceded the tax adjustment and the Tax Court granted partial summary judgment to the IRS Commissioner on that issue. The Tax Court also granted partial summary judgment to the Commissioner on the issue of whether the

---

[6] *See infra* p.9.

[7] 32, LLC was the original petitioner because it was the tax matters partner for the Partnership. It dissolved in February 2002 and the Tax Court appointed Palmlund as the Partnership's tax matters partner pursuant to Rule 250 of its Rules of Practice and Procedure.

Partnership had committed a gross valuation misstatement meriting the forty per cent accuracy-related penalty.[8] The only remaining issue before the Tax Court for trial was whether the Partnership had a reasonable cause defense under 26 U.S.C. § 6664(c)(1) to defeat the penalty.

After a trial, the Tax Court concluded that the Partnership had not established the reasonable cause defense because Palmlund, acting on behalf of the Partnership, did not establish his "actual good-faith reliance on Garza's, and Turner & Stone's, professional advice" in overstating the Partnership's basis in the Canadian currency. *106 Ltd.*, 136 T.C. at 78. According to the Tax Court, Palmlund "could not rely on their advice in good faith" because Garza and Turner & Stone were promoters of the shelter, Garza's opinion letter contained obvious inaccuracies, Palmlund should have known the transaction was improper given his business experience and Palmlund entered into the transaction with the intent to lose money. *Id*. at 81. The Partnership timely appeals.[9]

---

[8]    A "gross valuation misstatement" occurs if "the price for any property . . . claimed on any . . . return in connection with any transaction . . . is [400] percent or more . . . of the amount determined . . . to be the correct amount of such price." 26 U.S.C. § 6662(e)(1)(B)(i) and (h)(2)(A)(ii)(I). The Tax Court concluded— and the Partnership does not appeal—that the Partnership committed a gross valuation misstatement because the Partnership's reported basis of $2,974,000 in the distributed Canadian currency was more than 400 per cent of the Partnership's actual basis of $1,400.

[9]    Palmlund first appealed to the Fifth Circuit but, because the Partnership no longer existed—and therefore had no principal place of business—at the time Palmlund filed the petition for readjustment, the Fifth Circuit granted the Commissioner's motion to transfer the appeal here pursuant to 26 U.S.C. § 7482(b). *See* 26 U.S.C. § 7482(b)(1) ("in the case of a petition under section 6226,"

## II.

As noted earlier, the only question before us is whether the Tax Court erred in deciding that the Partnership, acting through Palmlund, failed to establish the reasonable cause defense for using a $2,974,000 basis in the distributed Canadian currency.[10] "Whether a taxpayer had reasonable cause [under section 6664(c)(1)] is a question of fact decided on a case-by-case basis" and "[w]e review this determination and the findings underlying it for clear error." *Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1381 (Fed. Cir. 2010); *see Am. Boat Co. v. United States*, 583 F.3d 471, 483 (7th Cir. 2009) ("Whether reasonable cause existed—and the findings underlying this determination—are questions of fact, which we review for clear error."); *see also United States v. Boyle*, 469 U.S. 241, 249 n.8 (1985) ("Whether the elements that constitute 'reasonable cause' are *present* in a given situation is a question of fact, but what elements *must* be

---

if partnership has no principal place of business "as of the time the petition . . . was filed with the Tax Court," Tax Court "decision[] may be reviewed by the Court of Appeals for the District of Columbia").

[10]   The Tax Court's jurisdiction to decide the accuracy-related penalty issue arose from the fact that the penalty "relates to an adjustment to a partnership item"—i.e., the Canadian currency. *Stobie Creek Invs.*, 608 F.3d at 1380 (internal quotation marks omitted); *see also* 26 U.S.C. § 6226(f) (tax court "shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of [FPAA] relates . . . and the applicability of any penalty . . . which relates to an adjustment to a partnership item"); *id.* § 6221 ("[T]he tax treatment of any partnership item (and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item) shall be determined at the partnership level.").

present to constitute 'reasonable cause' is a question of law." (emphases in original)).

## A.

Section 6662 of the Internal Revenue Code, 26 U.S.C. § 6662, imposes a mandatory accuracy-related penalty for certain tax underpayments. *See* 26 U.S.C. § 6662(a) ("If this section applies to any portion of an underpayment of tax required to be shown on a return, there shall be added to the tax an amount equal to 20 percent of the portion of the underpayment to which this section applies."). "If the underpayment is due to a 'gross valuation misstatement,' . . . the taxpayer must pay a penalty of forty percent of the delinquent tax." *Am. Boat Co.*, 583 F.3d at 480 (citing 26 U.S.C. § 6662(a), (h)).[11] Section 6664 provides a defense to an accuracy-related penalty "if the taxpayer proves it had (1) reasonable cause for the underpayment and (2) acted in good faith." *Stobie Creek Invs.*, 608 F.3d at 1381; *see* 26 U.S.C. § 6664(c)(1) ("No penalty shall be imposed under section 6662 . . . with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with

---

[11] Section 6662 provides for other accuracy-related penalties but the parties stipulated before the Tax Court that the forty per cent accuracy-related penalty for a gross valuation misstatement was the only penalty at issue. "Although partnerships do not pay federal income taxes," "[t]he partners are . . . responsible for reporting their distributive shares of the partnership's income or loss on their individual federal income tax returns." *Petaluma FX Partners*, 591 F.3d at 650. Thus, the forty per cent accuracy-related penalty is applicable to the understatement of taxes on Palmlund's individual income tax return attributable to the Partnership's gross-valuation misstatement. As discussed *supra* note 8, a gross valuation misstatement is "a misstatement of the correct adjusted basis by 400 percent or more." *Am. Boat. Co.*, 583 F.3d at 480.

respect to such portion."). "The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." 26 C.F.R. § 1.6664-4(b).

One way in which a taxpayer can establish the reasonable cause defense "is to show reliance on the advice of a competent and independent professional advisor." *Am. Boat Co.*, 583 F.3d at 481; *see also Boyle*, 469 U.S. at 251 ("When an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice." (emphasis in original)). By itself, however, "[r]eliance on . . . the advice of a professional tax advisor . . . does not necessarily demonstrate reasonable cause and good faith." 26 C.F.R. § 1.6664-4(b)(1). Rather, reliance on professional advice can establish the defense only "if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." *Id.*

To be reasonable, reliance on professional tax advice must meet several requirements. First, "[t]he advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances." 26 C.F.R. § 1.6664-4(c)(1)(i). Second, "[t]he advice must not be based on unreasonable factual or legal assumptions," including "a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true." *Id.* § 1.6664-4(c)(1)(ii). Third, "the taxpayer's reliance on the advice must itself be *objectively* reasonable," *Stobie Creek Invs.*, 608 F.3d at 1381 (emphasis in original), requiring, *inter alia*, that the advice not come "from parties who actively promote or implement the transactions in question," *id.* at 1382; *see also Mortensen v. Comm'r*, 440 F.3d 375, 387 (6th Cir. 2006) ("In order for reliance on professional tax advice to be reasonable, . . . the advice must generally be from a

competent and independent advisor unburdened with a conflict of interest and not from promoters of the investment."). "[T]he taxpayer's education, sophistication and business experience [are] relevant in determining whether the taxpayer's reliance on tax advice was reasonable and made in good faith." 26 C.F.R. § 1.6664-4(c)(1). And, contrary to the Partnership's suggestion, *see* Appellant's Br. 19 ("Determining whether one's reliance on an individual is in good faith is purely subjective."), the inquiry is objective, "focus[ing] . . . on what [the taxpayer] knew or should have known at the time he obtained the [advice]," *Am. Boat Co.*, 583 F.3d at 485.

## B.

We find no error—let alone clear error—in the Tax Court's determination that the Partnership failed to establish the reasonable cause defense because Palmlund unreasonably relied on both Garza's and Turner & Stone's advice. To begin with, the role of Garza "in promoting, implementing, and receiving fees from the [Son of BOSS] strategy" is more than sufficient to support the Tax Court's finding that he was a promoter and therefore possessed an inherent conflict of interest. *Stobie Creek Invs.*, 608 F.3d at 1382; *see also New Phoenix Sunrise Corp. v. Comm'r*, 408 F. App'x 908, 917 (6th Cir. 2010) (advisor's "involvement in the preparation of many of the documents needed to implement the [Son of BOSS] transaction[] supports [Tax Court] finding" that advisor was " 'promoting' the tax shelter"); *Tigers Eye Trading, LLC v. Comm'r*, 97 T.C.M. (CCH) 1622, 2009 WL 1475159 at *19 (May 27, 2009) ("[A]n adviser who participated in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction . . . is considered a 'promoter' of the transaction . . . ."). Garza brought the tax shelter opportunity to Palmlund's attention and he "coordinated the deal from start to finish." *106 Ltd.*,

136 T.C. at 80. Moreover, Garza made money out of the transaction. Palmlund paid Garza a fee of either $72,000 or $95,000 to execute the Son of BOSS transaction and Garza "wouldn't have been compensated at all if Palmlund decided not to go through with [the shelter]." *Id.* at 81. In addition, Garza "recommended" the transaction to "[m]ore than a dozen" other clients and used a "[v]ery similar" opinion letter for each client. Trial Tr. at 299.

With respect to Turner & Stone, it too implemented and profited from the transaction. Its tax return preparation services were essential to the execution of the transactions and it had worked with Garza previously to implement Son of BOSS tax shelters for other clients. Moreover, the $8,000 it charged Palmlund for tax return preparation far exceeded its normal charge of $1,500 and included research costs related to Son of BOSS transactions that it conducted for a *different* client. As the Tax Court found, the inflated fee represented Turner & Stone's "cut for helping to make the deal happen." *106 Ltd.*, 136 T.C. at 81.

Furthermore, Palmlund knew or should have known that Garza and Turner & Stone were promoters of the tax shelter. Garza "recommended" the Son of BOSS shelter to Palmlund, Trial Tr. at 299, and told Palmlund that he would "do everything" to implement it, *id.* at 55; *see Stobie Creek Invs.*, 608 F.3d at 1382 (unreasonable to rely on professional advisor if his "role as a promoter of the [Son of BOSS] strategy was evident"). One of Palmlund's accountants also testified that the Son of BOSS shelter "was referred—or brought to [Palmlund's] attention by Joe Garza." Trial Tr. at 314. Garza's fee statement included Garza's work in the "Formation of LLC Disregarded Entity[,] Formation of Limited Partnership[,] Negotiations with investment bank and review of transactions[,] Legal Opinion Letter [and] Tax return preparation and review." Statement for Services

Rendered (Nov. 7, 2001) (Fee Statement). Palmlund also testified that he went through with the deal despite knowing that "[Garza] was not a licensed broker." Trial Tr. at 120. Finally, Palmlund knew Garza was performing similar transactions for other clients. Palmlund testified that he knew Garza had "done this type of [transaction]" in the past, *id.* at 50, and that Garza told him he was "developing a financial organization" to handle similar transactions, *id.* at 120.

Palmlund also knew or should have known that Turner & Stone was working with Garza to structure and implement the tax shelter. *See Van Scoten v. Comm'r*, 439 F.3d 1243, 1253 (10th Cir. 2006) (unreasonable for taxpayer to rely on professional advisor "directly affiliated with the promoter"). Garza encouraged Palmlund to seek out Turner & Stone's advice regarding the Son of BOSS shelter because Garza "[had] been doing transactions with them," Trial Tr. at 50, and Garza informed Palmlund that "the accountants on [the transaction] would be Turner [&] Stone," *id.* at 55. Garza's fee statement "include[d] Mr. John Stone's tax accounting fees for [the Partnership]." Fee Statement. John Stone is the Stone of Turner & Stone. Garza also made clear to Palmlund that he and Turner & Stone intended to handle all of the necessary arrangements to execute the Son of BOSS shelter. According to Palmlund's testimony, Garza told him that he "[would not] have to do anything" and that "[w]e will do everything. We will take care of the taxes. We will take care of setting up the accounts." Trial Tr. at 55.

Notwithstanding Palmlund's earlier bona fide dealings with Garza and with Turner & Stone, we believe the Tax Court record establishes that Palmlund unreasonably relied on Garza and on Turner & Stone in this instance because he knew or should have known that his "advisors" were not providing independent advice and that they were in fact promoters of the tax shelter who possessed an inherent

conflict of interest. *See Stobie Creek Invs.*, 608 F.3d at 1383 (if taxpayer knew advisors were promoting Son of BOSS shelter, taxpayer's reliance was "not objectively reasonable . . . , regardless of [his] longstanding relationship with . . . or the reputations of [the advisors]"). Accordingly, the Tax Court did not err in concluding that the Partnership failed to establish the reasonable cause defense to the forty per cent accuracy-related penalty. *See id.* at 1382-83; *see also Am. Boat Co.*, 583 F.3d at 482 ("[C]ourts have upheld the imposition of penalties on taxpayers who relied on advisors involved in implementing [Son of BOSS tax shelters] . . . .").

In addition, the Tax Court did not clearly err in concluding that Palmlund unreasonably relied on Garza's opinion letter as a matter of law because it was "based upon [] representation[s] or assumption[s] which [Palmlund] kn[ew], or ha[d] reason to know, [were] unlikely to be true." 26 C.F.R. § 1.6664-4(c)(1)(ii). For instance, the letter relied on an "inaccurate representation . . . as to [Palmlund's] purposes for entering into [the] transaction." *Id.* The letter stated that Palmlund "believed there was reasonable opportunity to earn a reasonable pre-tax profit from the [Son of BOSS] transaction," Opinion Letter at 3 (Dec. 30, 2001), but Palmlund's banker, Charles Denson, testified that Palmlund said he entered the Son of BOSS shelter as a "tax strategy . . . and the intent was to lose money," Trial Tr. at 416. The Tax Court specifically credited Denson's testimony and a trial court's "credibility determinations are entitled to the greatest deference." *United States v. Erazo*, 628 F.3d 608, 611 (D.C. Cir. 2011) (internal quotation marks omitted); *see also Pasternak v. Comm'r*, 990 F.2d 893, 900 (6th Cir. 1993) ("Th[e] court must give great deference to the Tax Court's determination pertaining to the credibility of witnesses." (citing *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985))).

The letter contained other inaccuracies as well. It stated that Palmlund received the distributed Canadian currency "as [a] Partnership liquidating distribution[]," Op. Letter at 3, but the December 2001 distribution did not liquidate Palmlund's partnership interest because it distributed only thirty-five per cent of the Canadian currency. Importantly, Palmlund demonstrated his awareness of this fact by directing Turner & Stone to amend his individual tax return to reflect the distribution of thirty-five per cent of the Canadian currency. The opinion letter also claimed that the Partnership "do[es] not even now know if [it] will be called upon to satisfy [its] obligations under the [digital options]." *Id.* at 28. By the time Garza authored the letter, however, Palmlund had terminated the options, eliminating the Partnership's obligations under them. Accordingly, we see no basis upon which to conclude that the district court erred in concluding that Garza's opinion letter failed to comply with the requirements of 26 C.F.R. § 1.6664-4(c)(1) and that the Partnership's reliance thereon was unreasonable. *See* 26 C.F.R. § 1.6664-4(c)(1) ("In no event will a taxpayer be considered to have reasonably relied in good faith on advice (including an opinion) unless the requirements of this paragraph (c)(1) are satisfied."); *Long-Term Capital Holdings, LP v. United States*, 150 F. App'x 40, 42 (2d Cir. 2005) (no clear error in concluding taxpayer did not reasonably rely on professional advice for reasonable cause defense when "record provides ample support" for finding that advice "unreasonably rel[ied] on statements that the taxpayer knew were unlikely to be true").

Finally, even if Palmlund did not know about Garza's and Turner & Stone's conflicts of interest, we find no error in the Tax Court's determination that Palmlund's motive for entering into the tax shelter and his business experience "demonstrate[] [his] lack of good-faith reliance." *106 Ltd.*, 136 T.C. at 81. As noted earlier, the Tax Court credited

Denson's testimony that Palmlund's "intent was to lose money" on the tax shelter, *id*. at 73, and found that Palmlund participated in the shelter because of the "alluring tax benefit," *id*. at 70. Although Palmlund testified that he made investments only "to make money" and that he decided to enter into the Son of BOSS transaction based on a tip from a business partner's daughter, Trial Tr. at 54, 44, the Tax Court "was not required to credit [Palmlund's] self-serving explanation of his motives." *United States v. Bolla*, 346 F.3d 1148, 1153-54 (D.C. Cir. 2003). Moreover, the improbable tax advantages offered by the tax shelter—a $1 million dollar loss from a transaction that earned Palmlund $10,000 (less Garza's fees)—should have alerted a person with Palmlund's business experience and sophistication to the shelter's illegitimacy. *See Stobie Creek Invs.*, 608 F.3d at 1383 (no reasonable reliance if taxpayer had "sufficient knowledge and experience to know when a taxplanning strategy was likely 'too good to be true' " and selected strategy "because of a desire to avoid taxes that would otherwise be owed"); *see also Pasternak*, 990 F.2d at 903 (when tax deduction exceeded amount invested by fifty per cent, "a reasonably prudent person would have asked a tax advisor if th[e] windfall were not 'too good to be true' ").

For the foregoing reasons, we affirm the judgment of the Tax Court.

*So ordered.*