140 T.C. No. 12

UNITED STATES TAX COURT

LAWRENCE F. PEEK AND SARA L. PEEK, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

DARRELL G. FLECK AND KIMBERLY J. FLECK, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 5951-11, 6481-11.        Filed May 9, 2013.

In 2001 Ps established traditional IRAs. Ps formed FP Corp.
and directed their new IRAs to use rolled-over cash to purchase 100%
of FP Corp.'s newly issued stock. Ps used FP Corp. to acquire the
assets of AFS Corp. Ps personally guaranteed loans of FP Corp. that
arose out of the asset purchase. In 2003 and 2004 Ps undertook to
roll over the FP Corp. stock from their traditional IRAs to Roth IRAs,
including in Ps' income the value of the stock rolled over in those
years. In 2006 after the FP Corp. stock had significantly appreciated
in value, Ps directed their Roth IRAs to sell all of the FP stock. Ps'
personal guaranties on the loans of FP Corp. persisted up to the stock
sale in 2006. R contends that Ps' personal guaranties of the FP Corp.
loan were prohibited transactions, and, as a result, the gains realized
in 2006 and 2007 from the 2006 sales of FP stock should be included
in Ps' income.

Held: Each of Ps' personal guaranties of the FP Corp. loan was an indirect extension of credit to the IRAs, which is a prohibited transaction; and under I.R.C. sec. 408(e), the accounts that held the FP Corp. stock ceased to be IRAs.

Held, further, the gains realized on the sale of the FP Corp. stock are included in Ps' income.

Held, further, Ps are liable for the accuracy-related penalty under I.R.C. sec. 6662.

Sheldon Harold Smith, for petitioners.

Shawn P. Nowlan, E. Abigail Raines, and John Q. Walsh, Jr., for respondent.

GUSTAFSON, Judge: Pursuant to section 6212,[1] the Internal Revenue Service ("IRS") issued statutory notices of deficiency to petitioners Lawrence F. Peek and Sara L. Peek on December 9, 2010, and to petitioners Darrell G. Fleck and Kimberly J. Fleck on December 14, 2010, determining the following deficiencies in income tax and accuracy-related penalties under section 6662(a) for tax years 2006 and 2007:

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (26 U.S.C.), and all Rule references are to the Tax Court Rules of Practice and Procedure.

| Taxpayers | Year | Deficiency | Penalty sec. 6662(a) |
|-----------|------|------------|----------------------|
| Peek | 2006 | $223,650 | $44,730.00 |
|      | 2007 | 1,399 | 279.80 |
| Fleck | 2006 | 243,229 | 48,645.80 |
|       | 2007 | 4,948 | 989.60 |

The issues for decision in these consolidated cases are:  (i) whether Mr. Fleck's and Mr. Peek's personal guaranties of a loan to FP Company were prohibited transactions under section 4975(c)(1)(B);[2] and (ii) whether the Flecks and the Peeks owe accuracy-related penalties under section 6662(a).

---

[2]Because we hold that the loan guaranties were prohibited transactions, we need not and do not reach the additional questions of whether prohibited transactions occurred (i) when FP Company made payments of wages to Mr. Fleck and Mr. Peek (which the IRS contends were prohibited transactions under section 4975(c)(1)(D)), or (ii) when FP Company made payments of rent to an entity owned by Mrs. Fleck and Mrs. Peek (which the IRS contends were prohibited transactions under section 4975(c)(1)(E)).  (We also need not consider whether those issues constitute "new matter".  See note 3 below.)  Furthermore, because our holding that the loan guaranties were prohibited transactions resolves the income tax issues in favor of the IRS and against the petitioners, we need not reach the question whether Mr. Fleck and Mr. Peek would, in the alternative, owe excise tax for excess contributions to their successor IRAs under section 4973.

## FINDINGS OF FACT

These cases were submitted by the parties fully stipulated under Rule 122 for decision without trial,[3] and the stipulated facts are incorporated herein by this reference.

Abbot Fire & Safety, Inc.

In 2001 Mr. Fleck identified Abbott Fire & Safety, Inc. ("AFS"), as an attractive business opportunity. AFS specialized in providing alarms and fire protection, hood suppression systems, sprinkler systems, backflow inspections, fire extinguishers, and emergency lights for businesses. AFS also engaged in government-mandated compliance testing related to fire suppression and safety.

---

[3]The burden of proof is generally on the taxpayer, see Rule 142(a)(1), and the submission of a case as fully stipulated under Rule 122 does not alter that burden, see Borchers v. Commissioner, 95 T.C. 82, 91 (1990), aff'd, 943 F.2d 22 (8th Cir. 1991). However, the burden of proof can be shifted when the Commissioner's position implicates "new matter" that was not in the notice of deficiency. Petitioners point out that whereas the notice of deficiency determined that they had engaged in "prohibited transactions" forbidden in section 4975(c)(1)(C) and (F)--involving "furnishing of goods, services", etc., and "receipt of consideration * * * in connection with a transaction involving the income or assets of a plan"--the Commissioner now relies on section 4975(c)(1)(B), which prohibits "indirect * * * extension of credit". We note that the notices of deficiency make no mention of the loan guaranties. To the extent that this issue would require different evidence, it could constitute "new matter". However, we need not resolve that question, see Dagres v. Commissioner, 136 T.C. 263, 279 (2011), since the material facts are not actually in dispute, and we can resolve the case by a mere preponderance of the evidence.

Mr. Fleck contacted A.J. Hoyal & Co. ("A.J. Hoyal"), the brokerage firm through which AFS was offered for sale. While Mr. Fleck originally hoped to purchase AFS with a family member as partner, that relative was unable to join the venture. Instead, Mr. Peek, an attorney who had provided legal services to Mr. Fleck in the past, approached Mr. Fleck about joining the venture. (Mr. and Mrs. Fleck are not related to Mr. and Mrs. Peek.)

The IACC

A.J. Hoyal introduced Mr. Fleck to Christian Blees, a certified public accountant ("C.P.A.") at a Colorado Springs accounting firm. Mr. Fleck later introduced Mr. Blees to Mr. Peek. Neither Mr. Fleck nor Mr. Peek knew Mr. Blees previously. Mr. Fleck and Mr. Peek engaged Mr. Blees and his firm to assist in structuring the purchase of AFS's assets and to perform due diligence on the transaction.

Mr. Blees presented to Mr. Fleck and Mr. Peek information on a strategy he identified as the "IACC". On September 6, 2001, Mr. Blees gave to Mr. Fleck and Mr. Peek documents that described the IACC plan. This strategy called for the participant to establish a self-directed individual retirement account ("IRA"), transfer funds into that IRA from an existing IRA or section 401(k) plan account,

set up a new corporation, sell shares in the new corporation to the self-directed

IRA, and use the funds from the sale of shares to purchase a business interest.

In addition to describing the plan, the IACC documents included an

extensive discussion and an opinion letter from Mr. Blees about prohibited

transactions under section 4975, which state that such transactions would be

detrimental to the IACC plan's tax objectives. The documents warned that "the

taxpayer could not engage in transactions with the IRA that the IRS would

determine to be 'prohibited transactions'". Also included in the documents was a

letter from the accounting firm, which instructed:

> An important distinction to always recognize is that any actions you take on behalf of the corporation must be taken by you as an agent for the corporation and not by you personally. Any business done by the corporation must be done in its status as a corporation and realizing that you are acting as an agent of the corporation only. The corporation should exercise care to hold itself out at all times to the public as a corporation and not as some other type of entity, or as an extension of you personally.

> *       *       *       *       *       *       *

> Failure to properly manage the corporations [sic] affairs, or to conduct business in any manner other than at arms length could result in adverse effects to the corporation, your IRA, and to you personally. This might include, but is not limited to, the assessment of additional income taxes, penalties and interest from various taxing authorities.

None of the IACC documents indicate that Mr. Fleck or Mr. Peek informed their accountant that they might guarantee loans for the new corporation as part of their planned acquisition of AFS's assets; and the documents included no advice to the effect that an extension of credit or personal guaranty between petitioners and the new corporation would <u>not</u> be considered prohibited transaction for purposes of section 4975.

Mr. Peek completed and submitted an "IACC Application" and, in response, received the "IACC Plan for FP Company", a document that outlined a plan for the purchase of AFS's assets. Mr. Fleck and Mr. Peek subsequently implemented this plan and compensated Mr. Blees and his firm for structuring the purchase and performing due diligence. Both Mr. Fleck and Mr. Peek were aware of the compensation.

<u>Implementing IACC with FP Company</u>

Mr. Fleck and Mr. Peek each established at Vista Bank accounts intended to be self-directed IRAs, over which they each retained all discretionary authority and control concerning investments. Mr. Fleck rolled over funds on August 17, 2001, into his IRA (the "Fleck Vista IRA"), from an existing account maintained for his benefit at the Allied Domesq 401(k) Retirement Plan. Mr. Peek rolled over funds on August 30, 2001, into his IRA (the "Peek Vista IRA"), from an existing

account maintained for his benefit at Charles Schwab. Neither Mr. Fleck nor Mr. Peek contributed to the other's IRA.

On August 27, 2001, the articles of incorporation for FP Company, Inc. ("FP Company") were filed with the Colorado Secretary of State. At formation, Mr. Fleck and Mr. Peek intended that FP Company would purchase the assets of AFS and engage in the retail sale of fire suppression systems.

On September 11, 2001, each IRA purchased 5,000 shares of newly issued stock in FP Company for $309,000 and thereby acquired a 50% interest in FP Company. The Peek Vista IRA made its purchase at Mr. Peek's direction, and the Fleck Vista IRA made its purchase at Mr. Fleck's direction. In so doing, Mr. Peek and Mr. Fleck both intended that FP Company would purchase the assets of AFS. At the time of purchase, both Mr. Peek and Mr. Fleck also intended to serve as corporate officers and directors of FP Company.

In a transaction closed in mid-September 2001 (but with an agreed effective date of August 28, 2001), FP Company acquired most of AFS's assets for a price of $1,100,000, consisting of: (a) $850,000 in cash (derived from (i) a $450,000 bank loan to FP Company from a credit union and (ii) $400,000 of the proceeds of the sale of FP Company's stock to the IRAs); (b) a $50,000 promissory note from FP Company to A.J. Hoyal (the broker); and (c) a $200,000 promissory note from

FP Company to the sellers, secured by personal guaranties from Mr. Fleck and Mr. Peek.

As part of Mr. Fleck's and Mr. Peek's personal guaranties, a deed of trust on their personal residences was recorded in El Paso County, Colorado, on September 17, 2001. Mr. Fleck and Mr. Peek were grantors, and Leslie and Carol Heinrich, the shareholders of the corporation selling AFS's assets, were the grantees of the deed of trust. The guaranties remained in effect until the sale and merger of FP Company in 2006.

Operation of FP Company d.b.a. Abbott

On September 25, 2001, FP Company filed a Statement of Change of Registered Officer or Registered Agent with the Colorado Secretary of State, which named Mr. Peek as the new registered agent of FP Company. Also on September 25, FP Company filed two Certificates of Assumed or Trade Name, indicating that it would hereafter do business as "Abbott Fire & Safety, Inc." and "Abbott Fire Extinguisher Company, Inc."

From 2001 until the 2006 sale, Mr. Fleck and Mr. Peek were the only persons to serve as corporate officers and directors of FP Company.

Subsequent transactions involving the Fleck and Peek IRAs

In 2002 Mr. Fleck and Mr. Peek's accountants informed them that Vista Bank was terminating its services as custodian of the Fleck Vista IRA and the Peek Vista IRA. Consequently, they transferred the Fleck Vista IRA and the Peek Vista IRA to First Trust Co. of Onaga (to become the "Fleck Onaga IRA" and the "Peek Onaga IRA"). Each man intended the new account to be self-directed. In each new IRA the sole asset was the shares of FP Company previously held in the Vista IRAs.

In 2003 Mr. Fleck converted half of the Fleck Onaga IRA to a Roth IRA at the same bank (the "Fleck Roth IRA"); and Mr. Peek converted half of the Peek Onaga IRA to a Roth IRA (the "Peek Roth IRA"). In 2004 each transferred the remaining half of his Onaga IRA into his Roth IRA, so that thereafter each Roth IRA owned 50% of the stock of FP Company. Mr. Fleck and Mr. Peek each reported the fair market values of the converted portions of their accounts as taxable income for 2003 and 2004.

## 2006 sale and merger of FP Company

In 2006 the Roth IRAs sold FP Company to Xpect First Aid Co. Each Roth IRA received payments on the following dates and in the following amounts for its 50% interest in FP Company:

| Date | Payment |
|------|---------|
| 3/14/2006 | $1,385,920 |
| 4/5/2006 | 114,713 |
| 9/14/2006 | 63,932 |
| 11/9/2006 | 9,156 |
| 4/30/2007 | 94,471 |
| Total | 1,668,192 |

Following these payments, neither the Fleck Roth IRA nor the Peek Roth IRA owned any interest in FP Company, and neither Mr. Fleck nor Mr. Peek had any involvement with FP Company or Xpect First Aid Co.

## Administrative actions

Both the Flecks and the Peeks timely filed Federal income tax returns on Forms 1040, "U.S. Individual Income Tax Return", for the years 2006 and 2007. The IRS examined those returns, adjusted petitioners' income to include capital gain from the sale of FP Company stock,[4] and in the alternative imposed excise tax

---

[4]As a result of the increased income, the IRS also made computational adjustments to exemption amounts, student interest deductions (for the Flecks only), itemized deductions, and self-employment tax.

for excess contributions to Mr. Fleck's and Mr. Peek's Roth IRAs during 2006. The IRS issued statutory notices of deficiency to the Peeks on December 9, 2010, and to the Flecks on December 14, 2010.

The Peeks timely mailed their petition to this Court on March 8, 2011; and the Flecks timely mailed their petition to this Court on March 14, 2011. At the time they filed their petitions, both the Flecks and the Peeks resided in Colorado.

OPINION

I.     IRAs and prohibited transactions

A taxpayer who invests his money in the hope of making a gain over a period of years--whether to fund his retirement or for any other purpose--normally must pay tax on that gain as he realizes it. Sec. 1001(a), (c). His payment of the tax from time to time diminishes the size of his investment and thereby, to some extent, diminishes his future gains. However, a taxpayer may create an "individual retirement account", which is exempt from tax under section 408(e)(1) and in which his investment can therefore increase until his retirement without being diminished by income tax liability. As long as the account qualifies as an IRA, the taxpayer-investor is not liable for income tax on the gains, so that the undiminished investment account can earn maximum returns until the time comes for payout, when the taxpayer will finally owe income tax on those greater gains.

Under section 408, the benefit of the traditional IRA is thus deferral of income tax liability on retirement investment gains.[5] Mr. Fleck and Mr. Peek therefore used IRAs to make their investments in FP Company, with the intention of deferring until retirement their income tax liability on the gain they hoped for (and did experience) from that investment.

However, IRAs are subject to special rules, including the provision in section 408(e)(2)(A)[6] that an account ceases to qualify as an IRA if "the individual for whose benefit any individual retirement account is established * * * engages in any transaction prohibited by section 4975". The IRS contends that, under that provision, the Fleck Vista IRA, the Peek Vista IRA, and their successor IRAs ceased to qualify as IRAs as of the first day of 2001 through 2006 because Mr. Fleck and Mr. Peek made loan guaranties that were "prohibited transactions"

---

[5]To the extent Mr. Fleck and Mr. Peek attempted to use Roth IRAs under section 408A, their desired tax benefit was slightly different. A taxpayer investing through a Roth IRA does not exclude qualifying contributions to the Roth IRA from income, but once in the Roth IRA, investments grow tax free and qualifying distributions from the Roth IRA are not subject to tax. See sec. 408A. Because the IRAs ceased to qualify before the attempted Roth conversion, the Roth IRA rules of section 408A have no application in these cases.

[6]Section 408(e)(2)(A) provides: "If, during any taxable year of the individual for whose benefit any individual retirement account is established, that individual or his beneficiary engages in any transaction prohibited by section 4975 with respect to such account, such account ceases to be an individual retirement account as of the first day of such taxable year."

under section 4975(c)(1)(B).[7]  The IRS therefore concludes that the IRAs' assets are, under section 408(e)(2)(B),[8] deemed to have been distributed to Mr. Fleck and Mr. Peek, who both therefore owe income tax on the gain on sale in 2006 and 2007.  The petitioners dispute the IRS's contention that any prohibited transactions occurred, and instead contend that the IRAs remained qualified as such and therefore remained exempt from tax under section 408(e)(1).

## II.  Loan guaranties as prohibited transactions

The IRS argues that Mr. Fleck's and Mr. Peek's personal guaranties of the $200,000 promissory note from FP Company to the sellers of AFS in 2001 as part of FP Company's purchase of AFS's assets were prohibited transactions.  Section 4975(c)(1)(B) prohibits "any direct or indirect * * * lending of money or other extension of credit between a [retirement] plan and a disqualified person".  (Emphasis added.)  The petitioners counter that Mr. Fleck's and Mr. Peek's

---

[7]Section 4975(c)(1) enumerates categories of prohibited transactions, including "any direct or indirect-- * * * (B) lending of money or other extension of credit between a plan and a disqualified person".

[8]Section 408(e)(2)(B) provides:  "In any case in which any account ceases to be an individual retirement account by reason of subparagraph (A) as of the first day of any taxable year, paragraph (1) of subsection (d) applies [i.e., "any amount paid or distributed * * * shall be included in gross income by the payee or distributee"] as if there were a distribution on such first day in an amount equal to the fair market value (on such first day) of all assets in the account (on such first day)."

personal guaranties were not prohibited transactions because they did not involve "the plan" (i.e., in this case, the IRAs), whereas the extension of credit prohibited under section 4975(c)(1)(B) is "between a <u>plan</u> and a disqualified person".[9] (Emphasis added.) They acknowledge that a loan guaranty can fall within the prohibition, because, though it is not a <u>direct</u> extension of credit (i.e., a loan), it is an <u>indirect</u> extension of credit. See <u>Janpol v. Commissioner</u>, 101 T.C. 518, 527 (1993) ("An individual who guarantees repayment of a loan extended by a third party to a debtor is, although indirectly, extending credit to the debtor"). But petitioners argue that the prohibition applies only to an extension of credit that, whether direct (like a loan) or indirect (like a loan guaranty), is "between a plan and a disqualified person". The loan guaranties at issue were between disqualified persons (Mr. Fleck and Mr. Peek) and an entity <u>other than</u> the plans--i.e., FP Company, an entity owned by the IRAs, rather than the IRAs themselves.

---

[9]Section 4975(e)(2)(A) defines "disqualified person" as a "fiduciary," which is itself defined in section 4975(e)(3) as "any person who * * * exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets". See <u>Swanson v. Commissioner</u>, 106 T.C. 76, 88 n.13 (1996). The parties stipulated that Mr. Fleck and Mr. Peek each retained all authority and control over his Vista IRA and its successor IRAs, and that each used this discretion to direct their IRAs to invest in FP Company. Thus, Mr. Fleck and Mr. Peek were "disqualified person[s]" as to their IRAs for purposes of this section.

This reading of the statute, however, would rob it of its intended breadth. Section 4975(c)(1)(B) prohibits "<u>any</u> direct or <u>indirect</u> * * * extension of credit between a plan and a disqualified person". (Emphasis added.) The Supreme Court has observed that when Congress used the phrase "any direct or indirect" in section 4975(c)(1), it thereby employed "broad language" and showed an obvious intention to "prohibit[] something more" than would be reached without it. <u>Commissioner v. Keystone Consol. Indus., Inc.</u>, 508 U.S. 152, 159-160 (1993). As the Commissioner points out, if the statute prohibited only a loan or loan guaranty between a disqualified person and the IRA itself, then the prohibition could be easily and abusively avoided simply by having the IRA create a shell subsidiary to whom the disqualified person could then make a loan. That, however, is an obvious evasion that Congress intended to prevent by using the word "indirect". The language of section 4975(c)(1)(B), when given its obvious and intended meaning, prohibited Mr. Fleck and Mr. Peek from making loans <u>or</u> loan guaranties either directly to their IRAs <u>or</u> indirectly to their IRAs by way of the entity owned by the IRAs.

III.    <u>Tax consequences of the guaranties on the sale of stock</u>

The IRS's two notices of deficiency issued to petitioners for 2006 and 2007 are similar, and the one issued to the Flecks asserted:

> The prohibited transaction triggered a liquidation of the IRAs in the [sic] 2001. Following that liquidation, the stock of FP Company Inc. is treated as owned by the [sic] Fleck and another individual [i.e., Mr. Peek] personally. Consequently, Fleck and the other individual are taxed personally on any gain on the sale of such stock.

Petitioners seem to argue that the IRS's notices of deficiency issued for 2006 and 2007 are somehow too late (because the loan guaranties were made in 2001), and that in the absence of an earlier notice of deficiency the IRAs remained exempt. Petitioners suggest that if the IRAs did not lose their exemption until 2006, then petitioners would have realized ordinary income in that year, rather than the capital gain determined in the notices; and they argue that since the notices did not make that particular adjustment, the notices are somehow inadequate to support an assessment of tax based on capital gains. This argument either misconstrues the tax consequences to an individual who engages in prohibited transactions with respect to an IRA or perhaps exaggerates the importance of the wording of the notices. The notices determined deficiencies for 2006 and 2007 on the basis of a prohibited transaction that took place in 2001. We now redetermine those 2006 and 2007 deficiencies and decide (1) whether the accounts that held the FP Company stock were IRAs in 2006 when the stock was sold (we hold they were not), (2) when they ceased to be IRAs and therefore exempt from income tax (we hold in 2001), and (3) the tax consequences of their non-exemption (we hold Mr.

Fleck and Mr. Peek are liable for tax on the capital gains realized in 2006 and 2007 from the sale of the FP Company stock).

The loan guaranties were not a once-and-done transaction with effects only in 2001 but instead remained in place and constituted a continuing prohibited transaction, thus preventing Mr. Fleck's and Mr. Peck's accounts that held the FP Company stock from being IRAs in subsequent years.[10] On January 1, 2006, it remained true that Mr. Fleck and Mr. Peek guaranteed the loan to FP Company; if FP Company defaulted, they would pay. By its nature, the loan guaranty that each man made put him and his account in an indirect lending relationship that would persist until the loan was paid off.

Consequently, under section 408(e)(2)(A), each original account holding the FP Company stock ceased to qualify as an IRA in 2001. In 2003 and 2004 when Mr. Fleck and Mr. Peek established Roth IRAs, those accounts ceased to be Roth IRAs when they funded the accounts with FP Company stock, because the prohibited transactions continued as to those accounts. See sec. 408A(a) ("Except as provided in this section, a Roth IRA shall be treated for purposes of this title in

---

[10]Since the guaranties (i.e., the prohibited transactions) continued through the time of the sale of FP Company stock in 2006, we do not address what, if any, requirements there are to subsequently reform or resuscitate an IRA that, pursuant to the provisions in section 408(e)(1), has "ceased to be an individual retirement account".

the same manner as an individual retirement plan"). For the same reasons, the accounts holding the FP Company stock when the stock was sold in 2006 were not Roth IRAs, and the gains from the sale realized in 2006 and 2007 were not exempt from tax. The tax liability from the gain is properly attributable to Mr. Fleck and Mr. Peek as the creators and beneficiaries of the accounts that sold the FP Company stock. See secs. 671, 408(a), (e)(2)(A)(i). Petitioners have not challenged the IRS's calculation of gain on the sale or asserted that they were entitled to a higher basis in the stock than what the IRS allowed. They were therefore liable for tax on the gains realized in the sale transaction as determined in the notices of deficiency.[11]

---

[11]In the alternative, the IRS agues that Mr. Fleck and Mr. Peek owe excise tax on the excess contributions to their successor IRAs under section 4973(a). While section 4973(a) imposes an excise tax equal to 6% of the excess contribution made to a traditional/Roth IRA, this tax is imposed only for each subsequent year in which the excess contribution remains in the IRA. Under our holding here that when the IRAs engaged in prohibited transactions, they ceased to be IRAs and the value of the IRAs' assets constituted deemed distributions to Mr. Peek and Mr. Fleck personally, any excessive contribution to a new IRA was self-corrected and no excise tax would be due. We therefore do not address further this alternative theory.

IV.     Accuracy-related penalties

    A.      Substantial understatements

The IRS determined that the Flecks and the Peeks are liable for a 20% accuracy-related penalty because their underpayments were "substantial understatement[s] of income tax" under section 6662(b)(2).  By definition, an understatement of income tax is substantial if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return.  Sec. 6662(d)(1)(A).  Pursuant to section 7491(c), the Commissioner bears the burden of producing sufficient evidence showing that the imposition of the penalty is appropriate in a given case.  Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  He has met this burden of showing substantial understatements of income tax for 2006, since the adjustments for 2006 in the notices of deficiency result in deficiencies that exceed the requisite amounts.  The same cannot be said for the 2007 deficiencies; consequently, the Commissioner also maintains that both the 2006 and 2007 underpayments in these cases were attributable to "negligence or disregard of rules or regulations".  Sec. 6662(b)(1).

    B.      Negligence or disregard

For purposes of section 6662, "the term 'negligence' includes any failure to make a reasonable attempt to comply with the provisions of this title [i.e. 26

U.S.C.]". Sec. 6662(c). Negligence is defined as a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934 (1985). The term "disregard" includes any careless, reckless, or intentional disregard of the rules or regulations. Sec. 6662(c).

The underpayments in these cases result from petitioners' failures to report capital gain income that they realized from the 2006 sale of FP Company stock; instead petitioners contended that IRAs held the FP Company stock when the stock was sold and, therefore, the realized gains were not taxable. However, Mr. Fleck and Mr. Peek were well aware that prohibited transactions listed in section 4975 could be fatal to their IRA arrangements, because both the IACC information they received and an opinion letter from their accountant discussed section 4975 in detail. The IACC information expressly stated: "the taxpayer could not engage in transactions with the IRA that the IRS would determine to be 'prohibited transactions'".

Section 4975(c)(1)(B) clearly provides that any "indirect * * * lending of money or other extension of credit between a plan and a disqualified person" is a prohibited transaction. As we have held, Mr. Fleck's and Mr. Peek's personal guaranties to FP Company were "indirect * * * extension[s] of credit" to their

IRAs and were prohibited transactions, see Janpol v. Commissioner, 101 T.C. at 527, and no one advised them otherwise. Given Mr. Fleck's and Mr. Peek's knowledge about the hazards of prohibited transactions and their personal involvement with the FP Company transactions (in particular, their personal guaranties), we conclude that petitioners were negligent when they failed to report income from the sales of FP Company stock after Mr. Fleck and Mr. Peek had engaged in a prohibited transaction.

C.    Reasonable cause and good faith

Once the Commissioner meets this burden, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect. Rule 142(a); Higbee v. Commissioner, 116 T.C. at 447. Petitioners argue that, even if they owe tax on the gain from the sale of FP Company, they acted with reasonable cause and in good faith when they failed to report the capital gains at issue, because they relied on advice provided by Mr. Blees, the C.P.A. See sec. 6664(c) (accuracy-related penalty is not due with respect to any portion of an underpayment if it is shown that there was reasonable cause and taxpayer acted in good faith with respect to that portion). However, as Mr. Fleck and Mr. Peek knew, Mr. Blees was himself not a disinterested professional but rather an active promoter of the IACC. A "promoter" is "'an adviser who participated in

structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction.'" 106 Ltd. v. Commissioner, 136 T.C. 67, 79 (2011) (quoting Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121), aff'd, 684 F.3d 84 (D.C. Cir. 2012). What they received from Mr. Blees was not advice so much as a sales pitch.

Because of Mr. Blees's role as promoter, Mr. Fleck and Mr. Peek could not reasonably and in good faith rely on that advice. See 106 Ltd. v. Commissioner, 136 T.C. at 79 ("promoters take the good-faith out of good-faith reliance"). As the parties have stipulated, Mr. Blees sold to Mr. Fleck and Mr. Peek the IACC plan, which was later used to structure the purchase of AFS's assets. Mr. Blees was thus a promoter, and Mr. Fleck and Mr. Peek could not reasonably and in good faith rely on his advice to adopt the IACC.

Moreover, there is no indication that Mr. Fleck and Mr. Peek informed their accountant of their intention to personally guarantee FP Company loans, or that Mr. Blees gave them any advice that their personal guaranties would not be a prohibited transaction under section 4975. Rather, they were warned not to engage in any transactions that "the IRS would determine to be a 'prohibited transaction'".

Since Mr. Blees's advice did not address the issue of personal guaranties, we conclude that petitioners did not rely on their accountant's advice with regard to the prohibited transactions in these cases, and did not have reasonable cause or act in good faith in failing to report the capital gains in these cases.

We therefore sustain the imposition of the accuracy-related penalty under section 6662(a) for both years in issue in both cases.

To reflect the foregoing,

Decisions will be entered under

Rule 155.