ARTHUR S. JANPOL, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

DONALD BERLIN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5586–92, 5587–92.　　　Filed December 7, 1993.

*John N. Lieuwen* and *Patricia Tucker*, for petitioners.
*Thomas F. Eagan*, for respondent.

COHEN, *Judge*: Respondent determined deficiencies against petitioners individually and as transferees of Art Janpol Volkswagen, Inc. (AJVW), as follows:

Docket No. 5586–92

| | Transferee liability | | Deficiency | | |
| Year | Sec. 4975(a) | Sec. 6651(a)(1) | Sec. 4975(a) | Sec. 4975(b) | Sec. 6651(a)(1) |
|---|---|---|---|---|---|
| 1986 | $781 | $195 | $15,958 | - - - | $3,990 |
| 1987 | - - - | - - - | 41,259 | - - - | 10,315 |
| 1988 | - - - | - - - | 91,416 | - - - | 22,854 |
| 1991 | - - - | - - - | - - - | $2,747,607 | - - - |

Docket No. 5587-92

| | *Transferee liability* | | | *Deficiency* | |
| Year | *Sec. 4975(a)* | *Sec. 6651(a)(1)* | *Sec. 4975(a)* | *Sec. 4975(b)* | *Sec. 6651(a)(1)* |
|---|---|---|---|---|---|
| 1986 | $14,213 | $3,553 | $773 | - - - | $193 |
| 1987 | 17,078 | 4,270 | 13,335 | - - - | 3,334 |
| 1988 | - - - | - - - | 64,132 | - - - | 16,033 |
| 1991 | - - - | - - - | - - - | $1,589,008 | - - - |

By amendments to the answer, respondent claimed increased amounts under sections 4975(a) and 6651(a)(1). Respondent, however, has conceded that petitioners are not liable for so-called second tier taxes under section 4975(b). Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision in this Opinion are whether certain loans by petitioners to the Imported Motors Profit Sharing Trust (the trust) and guarantees by petitioners of lines of credit extended by a third party to the trust are prohibited transactions within the meaning of section 4975(c)(1)(B); whether the liquidation and dissolution of AJVW as of December 31, 1986, prevented it from being liable for the tax on prohibited transactions under section 4975(a) with respect to advances made during 1987; and whether respondent has correctly computed the excise tax under section 4975(a) with respect to the prohibited transactions. Petitioners' liability for the additions to tax under section 6651(a)(1) because of their failure to file excise tax returns will be decided separately after further briefs from the parties. Petitioners have conceded that a separate loan of money by the trust to a partnership in which AJVW was a general partner was a prohibited transaction subject to excise tax.

## FINDINGS OF FACT

At the time their petitions were filed, petitioner Arthur S. Janpol (Janpol) resided in New Mexico, and petitioner Donald Berlin (Berlin) resided in California. Janpol was a certified public accountant who actively practiced accounting from 1954 to 1960.

AJVW was incorporated on January 1, 1955, under the laws of the State of New Mexico and had its principal place of business in Albuquerque, New Mexico. AJVW owned and operated an automobile dealership in Albuquerque. On May 12, 1986, the inventory, equipment, and franchises of AJVW were sold to an unrelated third party.

Janpol and Berlin were each 50-percent shareholders in AJVW, were each members of the board of directors, and held the offices of president and vice president, respectively.

On January 1, 1962, AJVW established a defined contribution profit-sharing plan for its employees. The plan was known as the Imported Motors Profit Sharing Plan (the plan). Janpol and Berlin were participants in the plan.

The trust was created under the laws of the State of New Mexico to hold and administer the assets of the plan. Janpol and Berlin were trustees of the trust and beneficiaries of the trust. The trust was determined by the Secretary of the Treasury to be a trust described in section 401(a), exempt from tax under section 501(a).

From approximately 1963 to October 31, 1991, the trust held a license from the State of New Mexico to do business as a finance company and financed installment purchases of automobiles.

Paragraphs 11.02(g) and 11.02(i) of the plan and trust provided as follows:

11.02 *Investment of Fund.* The Trustee shall be authorized and empowered and in his discretion, but not by way of limitation to:

(g) Borrow or raise money, with the approval of the Board of Directors of the Employer, for the purposes of the Trust from the Employer or from others to the extent and upon such terms and conditions as the Trustee may deem desirable or proper; and for any sum so borrowed to issue his promissory note, as Trustee, and to secure the repayment thereof by pledging all or any part of the Trust Fund, except for segregated accounts or employee contribution accounts; and no person lending money to the Trustee shall be bound to supervise the application of the money borrowed, or to inquire into the validity, expediency or propriety of any borrowing;

\* \* \* \* \* \* \*

(i) Require indemnity from the Employer, to the Trustee's satisfaction, before taking any action with respect to which the Trustee may have reasonable ground for requesting such indemnification;

On January 22, 1980, the Administrator of Pension and Welfare Benefit Programs, U.S. Department of Labor, sent a

letter to the trustees of the trust. The letter stated, among other things, the conclusion that the plan's purchase of customer notes from AJVW, leasing of real property to AJVW, and receipt of loans from Berlin and Janpol gave rise to violations of the prohibited transaction provisions of the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, 88 Stat. 829 (current version at 29 U.S.C. sec. 1001 (1988)). The letter stated in part:

With regard to the loans, we understand that the plan has regularly borrowed large amounts of money from Berlin and Janpol, usually pursuant to six-month notes at interest rates ranging from 7-9% and secured by plan assets. Rather than requiring repayment, the lenders have generally allowed issuance of new notes upon expiration of the six month terms. From January 1, 1975, through December 31, 1977, the plan borrowed a total of more than $600,000 from Janpol. The amount owed by the plan to Janpol has steadily declined in recent years, from an amount in excess of $126,000 at the end of 1975, to $30,000 as of April 1978. The amount owed by the plan to Berlin has likewise declined over the past years, from $87,000 at the end of 1975, to $44,000 as of April 1978.

*   *   *   *   *   *   *

Although the loans described earlier are *from* Berlin and Janpol *to* the plan, they are prohibited by sec. 406(a)(1)(B), which makes the "lending of money or other extension of credit between the plan and a party in interest" a *per se* violation of ERISA. Similarly, the loans give rise to violations of sec. 406(b)(2), which prohibits a fiduciary from acting in a transaction on behalf of a party whose interests are adverse to those of the plan.

Janpol disagreed with the conclusion stated in the letter.

The Department of Labor did not institute any enforcement action against AJVW or petitioners prior to or during the years in issue. Although the Internal Revenue Service (IRS) audited AJVW on other matters, the loans from petitioners to the trust were not issues raised by the IRS prior to or during the years in issue. Relying on his own analysis of statutory definitions of prohibited transactions, Janpol failed to file excise tax returns with respect to the loan made by him to the trust. Berlin failed to file returns with respect to the loans made by him to the trust.

Until the sale of the assets of AJVW in May 1986, the trust financed automobile purchases almost exclusively for the customers of AJVW. At the time of the sale of the assets of AJVW, the trustees of the trust decided to finance automobile purchases for the customers of other automobile dealers in Albu-

querque and the State of New Mexico. On April 10, 1986, Sunwest Bank of Albuquerque (Sunwest) agreed to lend the principal amount of $5 million to the trust to finance automobile installment loans. Loan agreements were executed on May 21, 1986, between Sunwest and the trust. Janpol and AJVW executed joint and several guarantees of the trust's obligations under the loan agreements.

On November 3, 1986, AJVW adopted a plan of complete liquidation under section 337. AJVW was dissolved on or about December 31, 1986. On the date of dissolution, AJVW transferred as liquidation distributions assets with a fair market value of $809,775 to, or for the benefit of, Janpol and $732,355 to, or for the benefit of, Berlin. By reason of the transfer of its assets to petitioners, AJVW was rendered insolvent within the meaning of N.M. Stat. Ann. sec. 56-10-16A (Michie 1983).

Of the liquidation distributions received by them, Janpol and Berlin each transferred $500,000 to the trust as a loan. The trust thereafter continued its existence, holding and administering the assets of the plan for the benefit of the participants. By March 31, 1987, with minor exceptions, all participants in the plan except Janpol and Berlin had received their distributions from the trust.

During 1986, 1987, and 1988, petitioners loaned money to the trust in addition to the amounts loaned at the time of liquidation of the corporation. From time to time during those years, the trust made repayments of the loans, with interest, to petitioners.

After the dissolution of AJVW, Janpol continued to manage and operate the automotive finance business of the trust and received a monthly fee for his services.

On September 25, 1987, the May 21, 1986, loan agreement between Sunwest and the trust was amended to increase the line of credit available to the trust to $10 million. Berlin was substituted as the joint and several guarantor of the line of credit, along with Janpol, in place of AJVW. AJVW was released from the guarantee at that time. Loans were periodically made to the trust by Sunwest during 1986, 1987, and 1988 under the loan agreement and amended loan agreement.

## OPINION

Section 4975 provides in pertinent part:

SEC. 4975(a). INITIAL TAXES ON DISQUALIFIED PERSON.—There is hereby imposed a tax on each prohibited transaction. The rate of tax shall be equal to 5 percent of the amount involved with respect to the prohibited transaction for each year (or part thereof) in the taxable period. The tax imposed by this subsection shall be paid by any disqualified person who participates in the prohibited transaction (other than a fiduciary acting only as such).

\* \* \* \* \* \* \*

(c) PROHIBITED TRANSACTION.—

(1) GENERAL RULE.—For purposes of this section, the term "prohibited transaction" means any direct or indirect—

(A) sale or exchange, or leasing, of any property between a plan and a disqualified person;

(B) lending of money or other extension of credit between a plan and a disqualified person;

\* \* \* \* \* \* \*

(d) EXEMPTIONS.—The prohibitions provided in subsection (c) shall not apply to—

(1) any loan made by the plan to a disqualified person who is a participant or beneficiary of the plan if such loan [meets five specified requirements]—

\* \* \* \* \* \* \*

(3) any loan to a leveraged employee stock ownership plan (as defined in subsection (e)(7)), if—

(A) such loan is primarily for the benefit of participants and beneficiaries of the plan, and

(B) such loan is at a reasonable rate of interest, and any collateral which is given to a disqualified person by the plan consists only of qualifying employer securities (as defined in subsection (e)(8));

\* \* \* \* \* \* \*

(e) DEFINITIONS.—

\* \* \* \* \* \* \*

(2) DISQUALIFIED PERSON.—For purposes of this section, the term "disqualified person" means a person who is—

(A) a fiduciary;

(B) a person providing services to the plan;

(C) an employer any of whose employees are covered by the plan;

\* \* \* \* \* \* \*

(E) an owner, direct or indirect, of 50 percent or more of—

(i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation,

(ii) the capital interest or the profits interest of a partnership, or

(iii) the beneficial interest of a trust or unincorporated enterprise,

which is an employer or an employee organization described in subparagraph (C) or (D);

\* \* \* \* \* \* \*

(G) a corporation, partnership, or trust or estate of which (or in which) 50 percent or more of—

(i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation,

(ii) the capital interest or profits interest of such partnership, or

(iii) the beneficial interest of such trust or estate, is owned directly or indirectly, or held by persons described in subparagraph (A), (B), (C), (D), or (E);

(H) an officer, director (or an individual having powers or responsibilities similar to those of officers or directors), a 10 percent or more shareholder, or a highly compensated employee (earning 10 percent or more of the yearly wages of an employer) of a person described in subparagraph (C), (D), (E), or (G) \* \* \*

Parallel provisions, also adopted as part of ERISA, are found at 29 U.S.C. secs. 1002(14) and 1106-1108 (1988).

Although petitioners have not expressly agreed and merely "assume" that they are disqualified persons with respect to the trust, there is no doubt that they and AJVW were disqualified persons under several of the categories set forth in section 4975(e)(2).

## Loans to the Trust

Petitioners contend that only loans from a plan to a disqualified person are prohibited by section 4975(c)(1)(B). That contention is contrary to the plain meaning of the word "between" as used repeatedly in section 4975(c)(1) and in the parallel provisions of 29 U.S.C. sec. 1106(a)(1) (1988). See *Rutland v. Commissioner*, 89 T.C. 1137, 1146 (1987); *Leib v. Commissioner*, 88 T.C. 1474, 1480 (1987). With respect to 29 U.S.C. sec. 1106(a)(1)(B), the Court of Appeals in *Brock v. Citizens Bank*, 841 F.2d 344, 346 (10th Cir. 1988), stated:

The district court further found that any loan between a plan and a party in interest is a per se violation of 29 U.S.C. sec. 1106(a)(1)(B). The trustees contended there was no violation because they did not loan plan

assets to the Bank. The court correctly concluded, however, that sec. 1106 proscribes loans made by the party in interest to the plan as well as the reverse.

Loans by disqualified persons to a trust were held to be prohibited transactions under section 4975(c)(1)(B) in *Rutland v. Commissioner, supra* at 1147, where we ruled on a taxpayer's contention that a transaction that involved both a sale and a loan to a trust could not result in cumulating amounts subject to excise tax. We stated:

In our view, each prohibited transaction enumerated in section 4975(c) was designed to guard against particular instances of over-reaching by a person able to exert influence over the affairs of such a plan. For example, section 4975(c)(1)(A), which prohibits sales of property between a plan and a disqualified person, discourages a disqualified person from charging the plan an excessive price for such property. *Section 4975(c)(1)(B) prohibits a disqualified person from lending money or extending credit to a plan and thereby prevents such person from charging an excessive rate of interest or otherwise imposing unfavorable terms on such loan.* We can find no indication in ERISA or in the legislative history that the prohibited transaction restrictions are intended to be mutually exclusive. Indeed, such a view is inconsistent with ERISA's objective of preserving plan assets. We observe that a person with close ties to a plan may be able to exact terms unfavorable to such plan both on a sale of property and on a loan to the plan made for the purpose of purchasing such property. We believe that Congress drafted ERISA to prohibit *both* such transactions to guard against such a possibility. While the transactions at issue may not contain unfavorable terms, the "per se" rules of ERISA do not relieve the petitioners of liability under section 4975(a). For such reason, we conclude that both the sale of the property to the plan, and the issuance of the promissory note by the plan, constituted prohibited transactions. [Emphasis added.]

See also *Pearland Inv. Co. v. Commissioner*, T.C. Memo. 1991-562, in which we stated that the taxpayer's "advance of money to the Plan, purchase of the property, assumption of the construction indebtedness, and the issuance of the promissory note each constituted a separate 'prohibited transaction'." Petitioners' attempts to distinguish these cases are without merit.

The legislative history and the reasons for an absolute prohibition on certain transactions specified in section 4975(c)(1) were analyzed at length in *Leib v. Commissioner, supra* at 1479-1481, in which we concluded that prudent investment and good faith standards were not relevant with respect to liability for the tax imposed by section 4975(a). We

also noted that the specific exemption of certain transactions assisted in interpreting the language of the statute. *Id.* at 1478-1479. In this instance, it is apparent that the specific exemptions in section 4975(d)(1) and (3) are necessary to avoid the broad language of section 4975(c)(1)(B). Section 4975(d)(3) specifically permits "any loan to a leveraged employee stock ownership plan"—an exemption that would be unnecessary if petitioners' interpretation of section 4975(c)(1)(B) were correct.

The above-quoted language from *Rutland* also refutes petitioners' contention that the policy of section 4975(c) applies only to loans from a plan to disqualified persons. As the Supreme Court recently stated in *Commissioner v. Keystone Consol. Indus., Inc.*, 508 U.S. ____, ____, 113 S. Ct. 2006, 2012 (1993):

Before ERISA's enactment in 1974, the measure that governed a transaction between a pension plan and its sponsor was the customary arm's-length standard of conduct. This provided an open door for abuses such as the sponsor's sale of property to the plan at an inflated price or the sponsor's satisfaction of a funding obligation by contribution of property that was overvalued or nonliquid. Congress' response to these abuses included the enactment of ERISA's sec. 406(a)(1)(A), 29 U.S.C. sec. 1106(a)(1)(A), and the addition of sec. 4975 to the Internal Revenue Code.

Congress' goal was to bar categorically a transaction that was likely to injure the pension plan. S.Rep. No. 93-383, [(1973), 1974-3 (Supp.) C.B. 80, 174-175] pp. 95-96. * * *

In *Westoak Realty & Inv. Co. v. Commissioner*, 999 F.2d 308, 310 (8th Cir. 1993), affg. T.C. Memo. 1992-171, the court explained:

Prior to Congress' enactment of sec. 4975, prohibited transactions rules relied on an "arm's-length" standard of conduct. However, because this standard required substantial enforcement resulting in questionable effectiveness, Congress replaced the "arm's-length" standard with a per se rule to "substantially strengthen" the laws governing prohibited transactions. S.Rep. No. 383, 93d Cong., 1st Sess. 32 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4890, 4917; *see also Wood* [*v. Commissioner*], 955 F.2d [908] at 911-912 [(4th Cir. 1992)]. Congress' goal was to bar categorically a transaction that was likely to injure the pension plan. *Commissioner v. Keystone Consolidated Industries, Inc.*, 508 U.S. ____, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993). This purpose of maintaining the integrity of pension plans is reflected in the Senate Finance Committee Report on ERISA, S.Rep. No. 383, *reprinted in* 1974 U.S.C.C.A.N. at 4916:

[u]nfortunately, instances have arisen in which pension funds have been used improperly by plan managers and fiduciaries. The committee believes that this situation should not be permitted to continue and has adopted measures designed to reduce substantially the potentialities for abuse in this regard.

The Committee noted that the new rules (sec. 4975) would make enforcement more practical and better ensure the integrity of benefit plans.

The structure of sec. 4975 reflects Congress' purpose not just to tax abusive transactions, but to eliminate the "potentialities for abuse." Section 4975 imposes two levels of excise tax on "any disqualified person who participates in [a] prohibited transaction." The first level imposes a tax on the disqualified person equal to five percent of the amount involved in the prohibited transaction. The second level imposes an additional tax on the prohibited transaction equal to 100% of the amount involved if the transaction is not timely corrected. * * *

Thus, both the language of the statute and the legislative intent compel the conclusion that loans by disqualified persons to plans are absolutely prohibited.

### Guarantees of Sunwest Loans to the Trust

Petitioners also contend that execution of guarantees on behalf of a plan are not reasonably interpreted as "extension of credit." Section 4975(c) prohibits transactions that are engaged in directly or indirectly. Cf. *Commissioner v. Keystone Consol. Indus., Inc., supra.* An individual who guarantees repayment of a loan extended by a third party to a debtor is, although indirectly, extending credit to the debtor.

Petitioners argue that the guarantees did not constitute an extension of credit by them to the trust because the guarantees were conditioned on default by the trust and no default ever occurred. Petitioners' interpretation, however, would render meaningless the use in the statute of different terms, to wit, "loans" and "extensions of credit", and "direct" and "indirect". The Supreme Court has already said, in *Keystone Consol. Indus.*, that use of the latter terms requires that the statute be read broadly and that the terms describing the types of transactions that are prohibited are to be given their usual meanings in other areas of the tax laws. Congressional intent that guarantees be included within the concept of "extension of credit" for purposes of ERISA is expressly set forth in the H. Conf. Rept. 93-1280 (1974), 1974-3 C.B. 415, 469, which states that "a prohibited transaction generally

will occur if a loan to a plan is guaranteed by a party-in-interest".

If petitioners had directly agreed to provide a line of credit to the trust, the agreement would be a prohibited transaction for the same reasons that loans by petitioners to the trust, such as those previously discussed, are prohibited by section 4975(c). Until the trust drew on the line of credit, there would not be a prohibited loan, but the contract to make a loan is also prohibited as an extension of credit.

In the case of a guarantee:

*instanter* upon the payment by the guarantor of the debt, the debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, but, by subrogation, the result of the shift of the original debt from the creditor to the guarantor who steps into the creditor's shoes. * * * [*Putnam v. Commissioner*, 352 U.S. 82, 85 (1956); fn. ref. omitted.]

It is not enough to say, as petitioners do, that there is a difference between a loan and a guarantee. The guarantee is, in effect, also a contract to make a loan to the trust. It cannot be avoided at the time of default on the ground that petitioners did not intend to engage in a loan transaction prohibited by section 4975(c). The potential for abuse has been set in motion by the contract, and thus the contract, the guarantee, is prohibited whether or not the condition for liability to the third party has arisen.

## Liquidation of AJVW

Petitioners contend that there can be no prohibited transaction excise tax imposed upon AJVW for 1987, the year after its liquidation and dissolution. Respondent argues that, under N.M. Stat. Ann. sec. 53-16-24 (Michie 1983), the dissolution of a corporation does not take away or impair any remedy available to or against the corporation or its shareholders for any right or claim existing, or any liability incurred, prior to the dissolution. Respondent argues, therefore, that AJVW was liable for the tax on prohibited transactions with respect to advances made prior to and including September 24, 1987, the day before it was released from its continuing guarantee by Sunwest. Petitioners contend that Sunwest had no cause of action against the guarantors in 1987, because there was never a default by the trust.

AJVW continued to be liable on the guarantee until that guarantee was released, regardless of whether or not there was a default. The continuing guarantee, as discussed above, is the basis for liability for excise taxes under section 4975(a). That liability arose at the time of the guarantee and it continued as long as the guarantee continued, and the corporation continued to be liable for excise tax until the guarantee was released.

*Computation of Excise Tax*

In defining the amount involved for purposes of section 4975(a), section 4975(f)(4) provides as follows:

The term "amount involved" means, with respect to a prohibited transaction, the greater of the amount of money and the fair market value of the other property given or the amount of money and the fair market value of the other property received; * * * For purposes of the preceding sentence, the fair market value—

(A) in the case of the tax imposed by subsection (a), shall be determined as of the date on which the prohibited transaction occurs; * * *

The "amount involved" with respect to loans is the greater of interest actually charged or fair market interest. *Thoburn v. Commissioner*, 95 T.C. 132, 139 (1990). Petitioners argue that the actual interest charged should be used because it was less than fair market interest and thus benefited the trust. As previously discussed, however, benefit to the trust is irrelevant with respect to transactions that are per se violations of the statute. Petitioners have given us no reason not to apply the rule of *Thoburn* here.

Petitioners contend that respondent is trying to "double aggregate" the computation of the 5-percent tax under section 4975(a). The difference between the parties is illustrated with reference to specific loan transactions (other than the $500,000 transactions and the guarantees) as follows:

### Respondent's Computation

|  | *1986* | *1987* | *1988* |
|---|---|---|---|
| 1986 loans to plan | $34,771.52 | $34,771.52 | $34,771.52 |
| 1987 loans to plan | - - - | 66,798.31 | 66,798.31 |
| 1988 loans to plan | - - - | - - - | 25,971.52 |
|  | 34,771.52 | 101,569.83 | 127,541.35 |

|  | 1986 | 1987 | 1988 |
|---|---|---|---|
|  | × .05 | × .05 | × .05 |
|  | 1,738.58 | 5,078.49 | 6,377.07 |

*Petitioners' Computation*

|  | 1986 | 1987 | 1988 |
|---|---|---|---|
| Amount involved | $34,771.52 | $66,798.31 | $25,971.52 |
|  | × .05 | × .05 | × .05 |
|  | 1,738.58 | 3,339.92 | 1,298.58 |

Under section 4975(a), the tax is imposed on each prohibited transaction at the rate of 5 percent of the amount involved "for each year (or part thereof)" in the taxable period. Thus, as respondent argues, loans outstanding at the end of the previous year are new prohibited transactions on the first day of the next year for purposes of computing the amounts involved. See *Rutland v. Commissioner*, 89 T.C. 1137, 1151 (1987); *Lambos v. Commissioner*, 88 T.C. 1440, 1451-1453 (1987); cf. *Hockaden & Associates, Inc. v. Commissioner*, 800 F.2d 70 (6th Cir. 1986), affg. 84 T.C. 13 (1985).

Petitioners contend that the "net increase over the year" is the only amount that should be subject to tax on the first day of the following year. Respondent correctly treated the gross amount of the loans as prohibited transactions subject to tax during the years the loans remained outstanding. See *Westoak Realty & Inv. Co. v. Commissioner*, 999 F.2d 308 (8th Cir. 1993), affg. T.C. Memo. 1992-171; *Leib v. Commissioner*, 88 T.C. 1474, 1486-1487 (1987).