T.C. Memo. 2021-94

UNITED STATES TAX COURT

GLORIA ONONUJU, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22401-18.            Filed July 26, 2021.

Gloria Ononuju, pro se.

<u>Marissa R. Lenius</u> and <u>Jeremy H. Fetter</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>: Section 4958 imposes an excise tax on a "disqualified person" who engages in an "excess benefit transaction" with a tax-exempt charity.[1]

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

**[\*2]** The Internal Revenue Service (IRS or respondent) determined that petitioner was a disqualified person with respect to American Medical Missionary Care, Inc. (AMMC), an organization tax exempt under section 501(a) and (c)(3), and that she engaged in excess benefit transactions with it during 2014. The IRS accordingly determined a first-tier tax of $32,500 under section 4958(a) and (because petitioner failed to correct the improper transactions during the applicable period) a second-tier tax of $260,000 under section 4958(b). The IRS also determined additions to tax under section 6651(a)(1) and (2). We will sustain respondent's determinations to the extent set forth in this opinion.

FINDINGS OF FACT

The following facts are derived from the pleadings, a stipulation of facts, the exhibits attached thereto, the trial testimony, and documents admitted into evidence at trial. Petitioner resided in Georgia when the petition was filed. An attorney filed the petition on her behalf, but he withdrew shortly thereafter.

Petitioner has been married to Chidozie Ononuju at all relevant times. Mr. Ononuju, then a licensed medical doctor, incorporated AMMC in 1998. It was organized as a Michigan corporation to operate a medical facility in Saginaw, Michigan.

**[\*3]**  In 2000 AMMC applied to the IRS for recognition of tax-exempt status.  In its application it described its exempt purpose as the operation of a clinic to provide medical examination and treatment services for individuals unable to afford such services.  In December 2000 the IRS granted its application and recognized AMMC as tax exempt under section 501(a) and (c)(3).  AMMC has filed an annual return on Form 990, Return of Organization Exempt From Income Tax, for all relevant years.  Its returns for 2013 and 2014 were prepared by a professional preparer.

Mr. Ononuju was the founder of AMMC and served as its president from its inception through 2014.  Petitioner has been shown as holding various positions in AMMC over time.  In 2000 she was listed as a member of its board of directors.  She was listed as its secretary and treasurer in an annual report filed in October 2012 with the State of Michigan.  She was listed as its secretary and as a director on its Form 990 for 2013, and as its secretary on the Form 990 for 2014.  She regularly attended AMMC's board meetings during 2013 and 2014.  Neither she nor Mr. Ononuju had an employment contract with AMMC in either year.

On its Form 990 for 2013, the year preceding the tax year in issue, AMMC reported providing petitioner, in her capacity as "Secretary/Dir," compensation of $21,000.  AMMC concurrently reported providing compensation of $21,000 to

[*4] Mr. Ononuju in his capacity as "Pres/Dir." AMMC issued Forms W-2, Wage and Tax Statement, for 2013, reporting that it had paid petitioner and Mr. Ononuju wages of $26,000 apiece. They reported these amounts as wages on a jointly filed Form 1040, U.S. Individual Income Tax Return.

On its Form 990 for 2014 AMMC reported that petitioner and Mr. Ononuju had each received "reportable compensation from the organization" of zero. AMMC issued neither of them a Form W-2 for 2014. AMMC recorded no officer or director salaries in its general ledger for 2014. There is no indication in the minutes of its board meetings that AMMC intended to provide compensation to petitioner during 2014.

On their Form 1040 for 2014 petitioner and Mr. Ononuju reported no salaries or wages from any source. They included with the return two Schedules C, Profit or Loss From Business. Petitioner reported gross receipts of $20,000 and expenses of $25,096 from a beauty salon business. Mr. Ononuju reported gross receipts of $39,000 and expenses of zero for providing services as a medical doctor.

During 2014 AMMC maintained at financial institutions at least three checking accounts: a Bank of America account ending in 4070; a Saginaw Medical Federal Credit Union account ending in 7728 (Saginaw account); and a Finan-

[*5] cial Plus Credit Union account ending in 8723 (Financial Plus account). Petitioner had signature authority over all three accounts.

During 2014 AMMC issued petitioner biweekly checks drawn on the Saginaw account. Each check was in the amount of $1,000. At trial petitioner testified that this "was my paycheck because Dr. Ononuju put me on [AMMC's] payroll." These checks totaled $27,000 during 2014.

During 2014 AMMC issued petitioner monthly checks drawn on the Financial Plus account. These were all certified checks in amounts ranging from $6,000 to $10,000, and they totaled $88,000 during 2014. During the previous year AMMC had also issued petitioner monthly certified checks, in amounts ranging from $5,000 to $10,000, drawn on the Financial Plus account. In response to requests for information during the IRS examination, AMMC stated that the latter checks provided petitioner with a "living allowance." During 2014 AMMC also paid $15,000 to Blue Cross Blue Shield of Michigan for health insurance covering Mr. Ononuju, petitioner, and their family.

In 2014 the Michigan Board of Medicine (Board) received complaints about certain practices in which Mr. Ononuju had engaged. The Board commenced an investigation, which led to the revocation of his license to practice medicine in Michigan. Petitioner testified at trial that AMMC by late 2014 "was going down,

[*6] was already closing up."  In 2017 Mr. Ononuju departed from the United States for Nigeria.  Petitioner testified that the Board required Mr. Ononuju to "pay a huge sum of money" and that they were "just broke by the time he left."  Mr. Ononuju has resided in Abuja, the capital of Nigeria, since 2017.

In October 2015 the IRS commenced an examination of AMMC's Form 990 for 2013.  The revenue agent (RA) later expanded the examination to include AMMC's Form 990 for 2014 and potential excise tax liability of petitioner and Mr. Ononuju.  The RA found that Mr. Ononuju during 2014 had received un-explained payments from AMMC in the form of cash, checks, money orders, certified checks, and other benefits with a total value of $658,168.  The RA de-termined that these were excess benefits, the bulk of which was reflected in AMMC's general ledger as an "officer's receivable."  AMMC's Form 990 for 2014 showed that the receivable due from Mr. Ononuju had increased from $79,181 at the beginning of 2014 to $615,284 at the end of 2014.  The Form 990 reported that there existed no written loan agreement covering this receivable.

The RA determined that petitioner had also received excess benefits from AMMC.  He calculated these excess benefits as $130,000, consisting of $27,000 of checks drawn on AMMC's Saginaw account, $88,000 of certified checks drawn on AMMC's Financial Plus account, and $15,000 of health insurance benefits.

[*7] The RA determined that the checks and certified checks were used to defray the personal living expenses of the Ononuju family, including petitioner, her husband, and their eight children.

The RA determined that petitioner was required to file, by May 15, 2015, a return reporting the excess benefit transactions on Form 4720, Return of Certain Excise Taxes Under Chapters 41 and 42 of the Internal Revenue Code. Neither AMMC nor petitioner filed such a return. On May 9, 2018, the examining agent prepared on her behalf a substitute Form 4720 reporting for 2014 a first-tier excise tax of $32,500 under section 4958(a), computed as 25% of the excess benefits the RA determined petitioner to have received. This substitute for return (SFR) satisfied the requirements of section 6020(b).

On August 13, 2018, the IRS issued petitioner a timely notice of deficiency for 2014. This notice determined a first-tier excise tax of $32,500 and a second-tier excise tax of $260,000 under section 4958(b). The second-tier tax, computed as 200% of the excess benefit, is imposed when a disqualified person fails to correct the excess benefit transaction in timely fashion. The notice also determined an addition to tax of $7,313 under section 6651(a)(1) for failure to file a return on Form 4720 and an addition to tax of $5,525 under section 6651(a)(2) for failure to

[*8] pay the excise tax shown on the SFR.  Petitioner timely petitioned this Court for redetermination.

On August 10, 2018, the IRS issued Mr. Ononuju a notice of deficiency determining excise tax deficiencies and additions to tax in substantially larger amounts.  He timely petitioned for redetermination, and his case was docketed at docket No. 22414-18.  On October 9, 2018, the IRS issued AMMC a final adverse determination letter revoking its tax-exempt status retroactively to January 1, 2014.  The IRS determined that AMMC had failed to establish that "no part of [its] earnings inures to the benefit of any private shareholders or individuals" or that it was "operating exclusively for an exempt purpose."  AMMC timely petitioned for a declaratory judgment, and its case was docketed at docket No. 318-19X.

After granting several continuances, we set petitioner's and Mr. Ononuju's cases for remote trial via Zoomgov on September 24, 2020, with the place of trial being set for administrative purposes in Atlanta, Georgia, where petitioner then resided.  Mr. Ononuju did not appear for trial.  On October 5, 2020, we dismissed his case for lack of prosecution and sustained the excise tax deficiencies and additions to tax that the IRS had determined against him.  Mr. Ononuju likewise declined to prosecute the revocation case for AMMC.  On November 6, 2020, we

[*9] dismissed that case for lack of prosecution and sustained revocation of AMMC's tax-exempt status retroactively to January 1, 2014.

At the conclusion of trial in petitioner's case we directed the parties to file seriatim briefs. Respondent timely filed his brief. Petitioner did not file a brief.

OPINION

I. Burden of Proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving them erroneous. Rule 142(a); see Welch v. Helvering, 290 U.S. 111, 115 (1933). In certain circumstances section 7491 may shift the burden of proof to the Commissioner. But that section applies only for purposes of ascertaining a taxpayer's liability "for any tax imposed by subtitle A or B," which govern income, estate, and gift taxes. Sec. 7491(a)(1). Section 7491 has no application to a case such as this, which involves petitioner's liability for an excise tax determined under subtitle D. See Paschall v. Commissioner, 137 T.C. 8, 17 (2011); Repetto v. Commissioner, T.C. Memo. 2012-168, 103 T.C.M. (CCH) 1895, 1900. Petitioner thus bears the burden of proving that respondent's determinations are incorrect.

**[*10]** II.     Excise Tax Liability

A.     Statutory Structure

Section 4958 is captioned "Taxes on Excess Benefit Transactions."  Section 4958(c)(1)(A) defines an "excess benefit transaction" to mean "any transaction in which an economic benefit is provided by an applicable tax-exempt organization directly or indirectly to or for the use of any disqualified person if the value of the economic benefit provided exceeds the value of the consideration (including the performance of services) received for providing such benefit."  An "applicable tax-exempt organization" is defined to include an organization described in section 501(c)(3) and exempt from tax under section 501(a).  See sec. 4958(e)(1).

Section 4958(a)(1) imposes on each excess benefit transaction an excise tax "equal to 25 percent of the excess benefit" and provides that this tax "shall be paid by any disqualified person referred to in subsection (f)(1) with respect to such transaction."  If the excess benefit transaction is not corrected in timely fashion, the disqualified person is liable for a second-tier tax equal to 200% of the excess benefit.  See sec. 4958(b).  A "disqualified person" is defined to include (among others) "any person who was, at any time during the 5-year period ending on the date of * * * [an excess benefit] transaction, in a position to exercise substantial influence over the affairs of the organization."  Sec. 4958(f)(1)(A).

[*11] Congress enacted section 4958 not to collect revenue but to "deter insiders of an organization from using their positions of influence to receive unreasonable compensation." See U.S. Department of the Treasury's Proposals to Improve Compliance by Tax-Exempt Organizations: Hearing Before the Subcomm. on Oversight of the H. Comm. on Ways & Means, 103d Cong., 2d Sess. 15 (1994) (statement of Leslie B. Samuels, Assistant Secretary for Tax Policy, Dep't of the Treasury). "Before the enactment of section 4958, if an organization * * * did not comply with the rules regarding tax exemption, the Commissioner's only recourse was to revoke the organization's exemption." Caracci v. Commissioner, 118 T.C. 379, 414 (2002), rev'd, 456 F.3d 444 (5th Cir. 2006). Because revocation "falls on the organization[] rather than benefited individuals," Congress recognized the need for "intermediate sanctions." Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates & Gifts, para. 100.5 (2021), Westlaw FTXIEG. Intermediate sanctions are intended to deter malfeasance and incentivize insiders to restore the charity to the status quo ante. See ibid.; see also sec. 4958(b) (eliminating the 200% tax if the insider corrects the excess benefit transaction).

**[\*12]** B.    <u>Analysis</u>

        1.    <u>"Applicable Tax-Exempt Organization"</u>

An applicable tax-exempt organization includes any organization (other than a private foundation) described in section 501(c)(3) and exempt from tax under section 501(a). <u>See</u> sec. 4958(e); sec. 53.4958-2(a), Foundation Excise Tax Regs. In December 2000 the IRS recognized AMMC as an organization exempt from tax under section 501(a) and (c)(3). AMMC notified the IRS of its continued operation as a section 501(c)(3) organization by filing Forms 990 for all relevant years, including 2013 and 2014.

In October 2018 the IRS issued AMMC a final adverse determination letter revoking its tax-exempt status retroactively to January 1, 2014. In November 2020 we sustained that determination. <u>See</u> <u>Am. Med. Missionary Care, Inc. v. Commissioner</u>, T.C. Dkt. No. 318-19X (Nov. 6, 2020) (order of dismissal and decision). Despite that revocation AMMC remained, for purposes of section 4958, an "applicable tax-exempt organization" in 2014. That is because AMMC was described in section 501(c)(3) at least during 2010-2013 and thus "at any time during the 5-year period ending on the date of the transaction." Sec. 4958(e)(2); <u>see</u> sec. 53.4958-2(a)(5), Foundation Excise Tax Regs.

[*13]     2.     "Disqualified Person"

The Department of the Treasury has issued comprehensive regulations under section 4958, including an elaboration of what it means to be a "disqualified person." See sec. 53.4958-3, Foundation Excise Tax Regs. Persons holding specified powers and responsibilities with respect to a charity are automatically deemed to be "in a position to exercise substantial influence over * * * [its] affairs." Id. para. (c). These officials include voting members of the governing body, presidents, chief executive officers, chief operating officers, treasurers, and chief financial officers. Id. subparas. (1), (2), and (3). The category of "treasurers and chief financial officers" includes "any person who, regardless of title, has ultimate responsibility for managing the finances of the organization." Id. subpara. (3). "A person who serves as treasurer * * * has this ultimate responsibility unless the person demonstrates otherwise." Ibid.

Petitioner was listed as AMMC's treasurer and secretary on an annual report filed with the State of Michigan in October 2012. She was listed as its secretary and as a director on the Form 990 for 2013, and as its secretary on the Form 990 for 2014. Neither Form 990 showed any person as occupying the office of "treasurer." Petitioner had signature authority over at least three of AMMC's bank ac-

[*14] counts during 2013 and 2014, and she regularly attended AMMC board meetings during both years.

We need not decide whether petitioner was a disqualified person with respect to AMMC by virtue of being a director or having "ultimate responsibility for managing the finances of the organization." Sec. 53.4958-3(c)(3), Foundation Excise Tax Regs. She was a disqualified person in any event because she was married to Mr. Ononuju. Family members of disqualified persons, down to the level of great-grandchildren, are disqualified persons with respect to the charity. See id. para. (b)(1). As the president and founder of AMMC, Mr. Ononuju was clearly a disqualified person. See id. paras. (c)(2), (e)(2)(i). Petitioner is automatically deemed to be a disqualified person because she was Mr. Ononuju's "spouse." See id. para. (b)(1)(i).

### 3. "Excess Benefit Transactions"

"The term 'excess benefit transaction' means any transaction in which an economic benefit is provided by an applicable tax-exempt organization * * * [to] any disqualified person if the value of the economic benefit provided exceeds the value of the consideration (including the performance of services) received for providing such benefit." Sec. 4958(c)(1)(A). The statute further provides: "For purposes of the preceding sentence, an economic benefit shall not be treated as

**[*15]** consideration for the performance of services unless such organization clearly indicated its intent to so treat such benefit." Ibid. (emphasis added).

As a rule, an organization "is treated as clearly indicating its intent to provide an economic benefit as compensation for services only if the organization provides written substantiation that is contemporaneous with the transfer of the economic benefit at issue." Sec. 53.4958-4(c)(1), Foundation Excise Tax Regs. "If an organization fails to provide this contemporaneous substantiation, any services provided by the disqualified person will not be treated as provided in consideration for the economic benefit." Ibid.

The "contemporaneous substantiation" requirement can be satisfied in two ways--by timely reporting or by "other written contemporaneous evidence." Id. para. (c)(3). Timely reporting occurs if the organization reports a payment to the disqualified person as compensation on a Form W-2 or a Form 990 filed before the IRS commences its examination. Id. para. (c)(3)(i)(A)(1). Timely reporting also occurs if the disqualified person reports the payment as income on an original or amended Form 1040 filed before the earlier of the date on which the IRS commences its examination or supplies written documentation of a potential excess benefit transaction. Id. para. (c)(3)(i)(A)(2).

**[*16]** The "contemporaneous substantiation" requirement can also be satisfied by "other written contemporaneous evidence" showing that "the appropriate decision-making body or an officer authorized to approve compensation approved a transfer as compensation for services in accordance with established procedures." Id. para. (c)(3)(ii). Such evidence includes "[a]n approved written employment contract executed on or before the date of the transfer," other documentation showing that "an authorized body [contemporaneously] approved the transfer as compensation for services," and contemporaneous written evidence establishing "a reasonable belief by the * * * organization that a benefit was a nontaxable benefit." Ibid.

During 2014 petitioner received biweekly checks totaling $27,000, drawn on AMMC's Saginaw account, and monthly certified checks totaling $88,000, drawn on AMMC's Financial Plus account. With respect to the biweekly $1,000 check, she testified that this "was my paycheck because Dr. Ononuju put me on [AMMC's] payroll." But she offered no testimony or other evidence that she performed any services for AMMC. She consistently referred to AMMC as her husband's "business" and as "the name of his medical practice." She insisted: "I don't know about the business. The business is solely his." She testified: "I don't know anything about this case. I'm just a mother of eight children, and that was my job at that time." She testified that she had "a full-time job in whatever I do in

**[*17]** the family" and that she did not "know about finance or work for American Medical Missionary."

In any event petitioner supplied no contemporaneous substantiation to show that AMMC "clearly indicated its intent," sec. 4958(c)(1)(A), to treat the $27,000, much less the $88,000, as compensation for her services. AMMC did not report any of those payments as compensation to petitioner on a Form W-2, and petitioner did not report any of those payments as income on her Form 1040. AMMC explicitly stated on its Form 990 for 2014 that petitioner had received zero "reportable compensation from the organization" in that year. That statement was a clear contrast with AMMC's Form 990 for 2013, which stated that petitioner had received "reportable compensation from the organization" of $21,000.

Nor did petitioner supply any other type of contemporaneous substantiation. Specifically, she offered no evidence (such as an employment contract or minutes of board meetings) showing that "the appropriate decision-making body or an officer authorized to approve compensation approved * * * [her payments] as compensation for services in accordance with established procedures." Sec. 53.4958-4(c)(3)(ii), Foundation Excise Tax Regs. In the absence of contemporaneous substantiation, "any services provided by the disqualified person will not be treated as provided in consideration for the economic benefit." Id. para. (c)(1).

**[*18]** Petitioner is thus foreclosed from contending that the $115,000 she received was not an "excess benefit" because paid in consideration of her performance of services.[2]

Petitioner's principal submission at trial was that the $88,000 of checks drawn on the Financial Plus account, while made out to her, did not benefit her personally. She testified that she withdrew these funds from AMMC's account, at her husband's request, for distribution to needy people in Saginaw--e.g., to help them pay rent and utilities, to pay for children's after-school programs, and to reward children who got good grades at school. Mr. Ononuju allegedly asked her to do this because he was "a workaholic" who could not leave his medical practice. She testified: "I was just like a messenger. * * * [Mr. Ononuju would] say, go and get me a check and bring it to the office, or go and get a check and give [it] to these certain poor people."

---

[2]The regulations provide an exception whereby an organization will be treated as having "clearly indicated its intent" to provide a payment as compensation for services if "reasonable cause" is shown for its failure to report the payment as the Code requires. See sec. 53.4958-4(c)(3)(i)(B), Foundation Excise Tax Regs. To qualify for this exception, it must be established that "there were significant mitigating factors with respect to its failure to report" or that the failure "arose from events beyond * * * [its] control," and that it "acted in a responsible manner both before and after the failure occurred." Ibid. Petitioner did not rely on this exception at any point in this litigation, and she supplied no evidence at trial to establish that any of these conditions was satisfied.

**[\*19]** For a variety of reasons we did not find this testimony credible. The RA determined that Mr. Ononuju himself had taken several hundred thousand dollars from AMMC's accounts during 2014 via cash withdrawals, bank checks, certified checks, and money orders. Petitioner could not explain why this cash was not sufficient to enable her husband to make the alleged distributions.

The $88,000 paid to petitioner from AMMC's Financial Plus account, moreover, uniformly consisted of certified checks. These checks were issued to her on a regular monthly basis, generally in multiples of a thousand dollars. If petitioner was being sent to the bank as a messenger to get cash for distribution to those in need, it is counterintuitive that she would have brought back certified checks issued in this manner. She testified that she would hold these certified checks for a period of time and, when her husband needed money to give away, she would return to the bank, cash the check, and give the cash to her husband. We did not find this story line credible.

Petitioner admitted that she had no records to establish what she did with any of this money. She had no net income of her own for 2014; indeed, she reported a loss of $5,096 on her Schedule C. She testified that her husband likewise had little income in 2014 because AMMC was "going down." When asked how she was paying the living expenses of a family that included eight children, she

[*20] asserted that she was "getting help from family and friends." We did not find this testimony credible.

Far more plausible was the RA's determination that petitioner used the $88,000 to defray personal living expenses of the Ononuju family. Indeed, in response to the RA's requests for information, AMMC stated that the monthly certified checks issued to petitioner during 2013 constituted a "living allowance." Petitioner supplied no evidence to support a different conclusion regarding the monthly certified checks issued to her during 2014.

The balance of the excess benefits that the IRS determined petitioner to have received consisted of the $15,000 that AMMC paid Blue Cross Blue Shield to provide health insurance coverage for Mr. Ononuju, petitioner, and their family. The regulations supply a special rule for "nontaxable benefits" such as these. For purposes of section 4958(c)(1)(A), which defines "excess benefit transaction," an organization "is not required to indicate its intent to provide an economic benefit as compensation for services if the economic benefit is excluded from the disqualified person's gross income for income tax purposes." Sec. 53.4958-4(c)(2), Foundation Excise Tax Regs. Examples of such nontaxable benefits include "employer-provided health benefits." Ibid.

[*21] The evidence showed that Mr. Ononuju during 2014 was an employee of AMMC, serving both as its president and as a medical doctor rendering services to AMMC's clients. The Blue Cross Blue Shield coverage that AMMC provided to Mr. Ononuju and his family thus constituted "employer-provided health benefits." Ibid. Respondent does not dispute that these benefits were properly "excluded from the disqualified person's gross income for income tax purposes." Ibid. With respect to these health benefits, AMMC was "not required to indicate its intent to provide an economic benefit as compensation for services." Ibid. We accordingly conclude that AMMC's provision of health insurance benefits did not constitute an excess benefit transaction.

## C. Applicable Excise Taxes

During 2014 AMMC provided $115,000 of excess benefits to petitioner. Section 4958(a) imposes a first-tier tax equal to 25% of the excess benefit, payable by the disqualified person. Section 4958(a)(1) thus imposes on petitioner a first-tier tax of $28,750.

Section 4958(b) provides that, if a first-tier tax is imposed "and the excess benefit involved in such transaction is not corrected within the taxable period, there is hereby imposed a tax equal to 200 percent of the excess benefit involved." This second-tier tax, like the first-tier tax, is imposed on the disqualified person.

[*22] Sec. 4958(b), (f)(1). The second-tier tax is not discretionary with the IRS but is statutorily mandated.

"Correction" of an excess benefit transaction means "undoing the excess benefit to the extent possible, and taking any additional measures necessary to place the organization in a financial position not worse than that in which it would be if the disqualified person were dealing under the highest fiduciary standards." Sec. 4958(f)(6). The "taxable period" during which correction must occur (assuming the tax has not yet been assessed) is the period beginning with the date of the transaction(s) and ending on "the date of mailing a notice of deficiency * * * with respect to the tax imposed by subsection (a)(1)." Sec. 4958(f)(5)(A). The "taxable period" during which petitioner was obligated to make correction thus closed on August 13, 2018, when the notice of deficiency was mailed.

Petitioner did not correct the excess benefit transactions within the "taxable period" as thus defined. There is no evidence that she returned to AMMC, at any time, any portion of the $115,000 at issue. Nor did she show that she made any effort to place AMMC "in a financial position not worse than that in which it would be if * * * [she] were dealing [with it] under the highest fiduciary stan-

[*23] dards." Sec. 4958(f)(6). We accordingly hold that she is liable for a second-tier tax of $230,000 (200% × $115,000).[3]

D. Availability of Abatement

Section 4961(a) affords a disqualified person an additional opportunity to avoid the second-tier tax. It provides that, if the taxable event is corrected "during the correction period," the second-tier tax "shall not be assessed, and if assessed the assessment shall be abated, and if collected shall be credited or refunded as an overpayment." For this purpose, the "correction period" means, with respect to any taxable event:

> the period beginning on the date on which such event occurs and end-ing 90 days after the date of mailing under section 6212 of a notice of deficiency with respect to the second tier tax imposed on such taxable event, extended by--
>
> > (A) any period in which a deficiency cannot be assessed under section 6213(a) * * * , and

---

[3]Although petitioner testified that she and her husband were "just broke by the time he left" for Nigeria in 2017, she supplied no documentary evidence about her actual financial circumstances at that time. Assuming arguendo that inability to pay could be relevant under section 4958(b), petitioner was obligated to estab-lish, at the very least, that she endeavored to place AMMC "in a financial position not worse than that in which it would be if * * * [she] were dealing [with it] under the highest fiduciary standards." Sec. 4958(f)(6). At no point in this litigation did she attempt to make such a showing.

**[\*24]**           (B) any other period which the Secretary determines is reasonable and necessary to bring about correction of the taxable event. [Sec. 4963(e)(1).]

Under these rules, the "correction period" will remain open at least until this Court's decision has become final following any appeal. See secs. 6213(a), 7481(a). Section 4961(b) grants us jurisdiction "to conduct any necessary supplemental proceeding to determine whether the taxable event was corrected during the correction period." Any such proceeding must begin within 90 days "after the last day of the correction period." Sec. 4961(b). Petitioner thus retains the opportunity to avoid assessment and collection of the second-tier tax.[4]

III.    Additions To Tax

   A.    Failure To File

Section 6651(a)(1) provides for an addition to tax of 5% of the tax required to be shown on a return for each month or fraction thereof for which there is a failure to file the return, not to exceed 25% in toto. Respondent determined that

---

[4]Somewhat similarly, section 4962 provides for nonassessment or abatement of the first-tier tax in certain circumstances. To qualify for this treatment, the disqualified person must establish two facts "to the satisfaction of the Secretary." Sec. 4962(a). Specifically, she must show (1) that the taxable event "was due to reasonable cause and not to willful neglect" and (2) that the event "was corrected within the correction period for such event." Ibid. The "correction period" for the first-tier tax is the same as for the second-tier tax. See sec. 4963(e)(1) (defining correction period "[f]or purposes of this subchapter").

[*25] petitioner was required to file, by May 15, 2015, a return on Form 4720 reporting the excess benefit transactions.  Because petitioner did not file such a return, the RA determined an addition to tax of $7,313 under section 6651(a)(1).

Tax-exempt organizations are required to file Form 4720 to report liability for various excise taxes, including taxes imposed for self-dealing (sec. 4941), excess business holdings (sec. 4943), investments that jeopardize charitable purpose (sec. 4944), political expenditures (sec. 4955), and excess benefit trans-actions (sec. 4958).  See sec. 53.6011-1(b), Foundation Excise Tax Regs. (im-posing this filing requirement).  AMMC did not file a Form 4720 for 2014.  The RA concluded that petitioner was therefore required to file a separate return on Form 4720 by May 15, 2015.  See ibid. (providing that "[e]very person" liable for tax imposed by section 4958(a) shall file such a return); 2014 IRS Instructions for Form 4720, at 2 ("[D]isqualified persons * * * who owe tax under Chapter 41 or 42 * * * [and] do not sign the return of the entity, must file a separate return on Form 4720 showing the tax owed and the name of the entity for which you owe tax.").

We have not previously addressed, at least not squarely, whether additions to tax apply when a disqualified person fails to file timely a Form 4720 reporting excess benefit transactions.  Cf. H. Fort Flowers Found., Inc. v. Commissioner, 72

**[\*26]** T.C. 399, 410-411 (1979) (holding that a tax-exempt organization had reasonable cause for failure to file Form 4720 reporting section 4942 excise tax for failure to distribute income). In analogous contexts we have ruled that additions to tax may apply when individuals affiliated with tax-exempt entities failed to file other IRS forms reporting excise taxes under other Code provisions. In those cases we reasoned that section 6651(a)(1) generally applies to the nonfiling of "any return required under authority of subchapter A of chapter 61," and that the filing requirement in question was imposed by regulations issued under section 6011, which is included within subchapter A of chapter 61. See, e.g., Janpol v. Commissioner, 102 T.C. 499, 500 (1994) (failure to file Form 5330 reporting section 4975 excise tax on prohibited transactions), supplementing 101 T.C. 518 (1993); Morrissey v. Commissioner, T.C. Memo. 1998-443, 76 T.C.M. (CCH) 1006, 1013 (same); see also Repetto, 103 T.C.M. (CCH) at 1904 (failure to file Form 5329 reporting section 4973 excise tax on excess IRA contributions).

Section 6011(a) provides that, "[w]hen required by regulations prescribed by the Secretary any person made liable for any tax imposed by this title \* \* \* shall make a return or statement according to the forms and regulations prescribed by the Secretary." The Secretary has prescribed regulations under section 6011 mandating that "[e]very person liable for tax imposed by section[] \* \* \* 4958(a)

**[*27]** * * * shall file an annual return on Form 4720." Sec. 53.6011-1(b), Foundation Excise Tax Regs. Because this filing requirement was promulgated under the authority of section 6011(a), petitioner's failure to file Form 4720 may subject her to liability for an addition to tax. See Janpol, 102 T.C. at 500.

To avoid liability petitioner must demonstrate that her failure to file was "due to reasonable cause and not due to willful neglect." Sec. 6651(a)(1). Reasonable cause exists "if the taxpayer exercised ordinary business care and prudence but, nevertheless, was unable to file the return within the time prescribed by law." Niedringhaus v. Commissioner, 99 T.C. 202, 221 (1992). "A taxpayer's belief that no return is required in itself is not sufficient to show that the failure to file was due to reasonable cause." Ibid. "[C]ircumstances considered to constitute reasonable cause arise as a result of factors beyond a taxpayer's control," such as "postal delays, timely filing of a return with the wrong office, death or serious illness of the taxpayer or a member of his immediate family, [or] the taxpayer's unavoidable absence from the United States." Paschall, 137 T.C. at 21. Petitioner did not file a brief, and she did not allege at trial that any such events prevented her timely filing.

Petitioner represented that she had no involvement in AMMC, that it was her husband's "business," and that her husband and his accountant handled all tax

[*28] return preparation. She testified that the accountant became ill in 2014, suggesting that his illness caused the failure to file. But "reliance on a tax adviser to prepare the return does not constitute reasonable cause." Paschall, 137 T.C. at 22 n.16. In any event a different accountant prepared AMMC's Form 990 and her Form 1040 for 2014, and she offered no explanation why that accountant failed to file Form 4720. Nor did she allege that the accountant advised her that it was unnecessary to file that form. Cf. United States v. Boyle, 469 U.S. 241, 251-252 (1985) (noting that a taxpayer might reasonably rely on a tax professional's advice that no return was required to be filed). Petitioner has thus failed to meet her burden.

The Form 4720 is admittedly an exotic species: The obligation to file this return--unlike the obligation to file (say) Form 1040--is far from common knowledge, especially for someone not actually involved in a charity's operations. Petitioner had received monthly checks from AMMC for prior years, and we do not believe that she understood that such transactions needed to be reported on an excise tax return. "[I]gnorance of the law, however, does not amount to reason-

[*29] able cause." <u>Rayhill v. Commissioner</u>, T.C. Memo. 2013-181, 106 T.C.M. (CCH) 100, 101.[5]

### B.    Failure To Pay

Section 6651(a)(2) provides for an addition to tax when a taxpayer fails to pay timely the tax shown on a return unless the taxpayer proves that the failure was "due to reasonable cause and not due to willful neglect." To meet his burden of production under section 7491(c) with respect to the section 6651(a)(2) addition to tax, respondent must provide evidence of a tax return. <u>See</u> <u>Wheeler v. Commissioner</u>, 127 T.C. 200, 208-211 (2006), <u>aff'd</u>, 521 F.3d 1289 (10th Cir. 2008). An SFR that meets the requirements of section 6020(b) is treated as the "return" filed by the taxpayer for this purpose. <u>See</u> sec. 6651(g)(2).

On May 9, 2018, the examining agent prepared on petitioner's behalf a substitute Form 4720 reporting for 2014 a first-tier excise tax of $32,500 under section 4958(a), computed as 25% of the excess benefits the RA determined petitioner to have received. This SFR satisfied the requirements of section 6020(b). Respondent has thus met his burden of production under section 6651(a)(2).

---

[5]Petitioner was represented by counsel during the IRS examination, which began in 2015. We need not decide whether she might have shown "reasonable cause" by filing a Form 4720 at some point before the RA prepared the substitute Form 4720 in May 2018.

**[\*30]** This addition to tax will not apply if the taxpayer shows that the failure to pay was "due to reasonable cause and not due to willful neglect." Sec. 6651(a)(2). "The determination of whether the taxpayer had reasonable cause pursuant to section 6651(a)(2) is similar to the analysis of reasonable cause pursuant to section 6651(a)(1) except that undue financial hardship may be a defense to the failure to pay." Hardin v. Commissioner, T.C. Memo. 2012-162, 103 T.C.M. (CCH) 1861, 1863; see sec. 301.6651-1(c)(1), Proced. & Admin. Regs. "To establish undue hardship, the taxpayer must show that making the tax payment on time would have required 'the risk of a substantial financial loss.'" Hardin, 103 T.C.M. (CCH) at 1863 (quoting Merriam v. Commissioner, T.C. Memo. 1995-432, 70 T.C.M. (CCH) 627, 636, supplemented by T.C. Memo. 2005-17, aff'd, 107 F.3d 877 (9th Cir. 1997)).

We conclude that petitioner's failure to pay, like her failure to file, was not due to reasonable cause. She testified that the Michigan Board made her husband "pay a huge sum" and that she was "broke" by the time he left the United States in 2017. But she provided no documentary evidence to establish either fact, and she supplied no financial records to demonstrate that she would suffer undue hardship if payment were made. Although petitioner may have faced challenges as a mother of eight children, she produced no credible evidence that would enable us

**[\*31]** to conclude that paying the taxes would have caused "undue hardship." <u>See</u>

<u>Wilson v. Commissioner</u>, T.C. Memo. 2012-229, 104 T.C.M. (CCH) 170, 174

(holding that a taxpayer failed to meet her burden where she asserted only that she

was "a single mother living * * * in tough economic times").

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.